No. 00-282

IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 138

IN THE MATTER OF D.T.H.,

Youth in Need of Care.

APPEAL FROM: District Court of the Thirteenth Judicial District,

In and for the County of Yellowstone,

The Honorable Russell C. Fagg, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Kathryn S. Syth, Attorney at Law, Billings, Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General; Cregg W. Coughlin,

Assistant Attorney General, Helena, Montana

Dennis Paxinos, Yellowstone County Attorney; Melanie Logan,

Deputy County Attorney, Billings, Montana

Guardian Ad Litem:

Damon L. Gannett, Gannett Law Firm, Billings, Montana

Submitted on Briefs: November 9, 2000
Decided: August 2, 2001

Filed:

_____

Clerk

Chief Justice Karla M. Gray delivered the Opinion of the Court.

¶1 C.T. appeals from the judgment entered by the Thirteenth Judicial District Court, Yellowstone County, on its findings of fact, conclusions of law and order terminating her parental rights to her son, D. T.H. We affirm.

¶2 The issue on appeal is whether the District Court erred in adjudicating D.T.H. a youth in need of care.

## BCKGROUND

¶3 On March 19, 1999, the Montana Department of Public Health and Human Services (DPHHS) petitioned the District Court for temporary investigative authority (TIA) and emergency protective services over both C.T. and D.T.H. In support of its petition, DPHHS filed a report to the court alleging that it had received a report of concern regarding C.T. and her child. Upon investigation, DPHHS learned C.T. had been fifteen years old when she had sexual intercourse with her stepfather, D.H., age 38, and conceived D.T.H.,who was born on January 31, 1999. The report further alleged that C.T. had stated she saw nothing wrong about her relationship with her stepfather and she intended to marry him as soon as he divorced her mother, M.H. Additionally, M.H. stated there was no reason for concern regarding her daughter's relationship with D.H. because M.H. had given her consent and she agreed with the plan that she divorce D.H. so he and C.T. could marry. According to her, all three would then continue to reside together. DPHHS's report also raised concern regarding a variety of tattoos that D.H. had given C.T. following D.T.H.'s birth. Based on this report, DPHHS requested the District Court to grant the TIA in order to assess the safety of D.T.H.

¶4 The District Court granted DPHHS's request for emergency protective services and scheduled a show cause hearing on the TIA petition. At the show cause hearing, DPHHS social worker Sarah Blackburn (Blackburn) testified that, although there was no indication of actual abuse or neglect of D.T.H., there was concern for his safety should he be placed in the home with C.T. and D.H. She stated that the circumstances surrounding D.T.H.'s conception placed C.T.'s ability to adequately parent him in question. Blackburn further testified that D.H.'s sexual relationship with C.T. constituted a sex offense because C.T.

was underage and, in light of the continuing nature of the relationship, more information regarding D.H.--in the form of a psychological sexual offender evaluation--was needed to determine whether he would be a risk to D.T.H.'s safety. Based on this testimony, the District Court concluded that there was a danger of abuse or neglect to D.T.H., making him a youth in need of care, and granted the TIA. The court also granted DPHHS TIA over C.T.

¶5 C.T. subsequently moved to dismiss the TIA regarding D.T.H., arguing no evidence existed to establish that D.T.H. was abused or neglected or in danger of being abused or neglected and, therefore, he was not a youth in need of care. The next day, DPHHS moved the District Court to extend both TIAs for an additional 90 days to allow further investigation of the case. Shortly thereafter, M.H. moved to dismiss the TIA regarding C. T. on the basis that C.T. and D.H. had recently married and, as a result, she no longer had parental authority over C.T. The court held a joint hearing on the motions, following which it denied the motions to dismiss and extended both TIAs for 90 days.

¶6 On November 30, 1999, DPHHS petitioned to terminate the parental rights of C.T. and D.H. to D.T.H. and M.H.'s parental rights to C.T. On January 28, 2000, on motion of DPHHS, the District Court dismissed the action regarding C.T. as a youth in need of care. The case proceeded to a hearing on the petition to terminate the parental rights to D.T.H. Following the hearing, the District Court entered findings of fact, conclusions of law and an order terminating the parental rights of C.T. and D.H. to D.T.H. C.T. appeals.

## STANDARD OF REVIEW

¶7 We review a district court's conclusions of law in a youth in need of care proceeding to determine whether those conclusions are correct. In re M.P.M., 1999 MT 78, ¶ 12, 294 Mont. 87, ¶ 12, 976 P.2d 988, ¶ 12. We review a court's findings of fact to determine whether the findings are clearly erroneous. In re M.P.M., ¶ 12. A finding of fact is clearly erroneous if it is not supported by substantial evidence, the court misapprehended the effect of the evidence, or a review of the record leaves us with a definite and firm conviction that the court made a mistake. In re J.M.J., 1999 MT 277, ¶ 15, 296 Mont. 510, ¶ 15, 989 P.2d 840, ¶ 15.

## DISCUSSION

¶8 Did the District Court err in adjudicating D.T.H. a youth in need of care?

¶9 Section 41-3-609(1)(f), MCA, provides that a court may terminate a parent-child legal relationship upon finding that the child is an adjudicated youth in need of care and both of the following exist:

> (i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and

> (ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time.

> Following the hearing on DPHHS's petition to terminate, the District Court entered findings conforming with the above criteria and terminated C.T.'s parental rights on that basis. C.T. contends that termination of her parental rights was improper because the District Court's underlying adjudication of D.T.H. as a youth in need of care was erroneous.

¶10 A youth in need of care is defined as "a youth who has been adjudicated or determined, after a hearing, to be or to have been abused or neglected." Section 41-3-102 (23), MCA. An abused or neglected youth is one who has suffered child abuse or neglect. Section 41-3-102(3), MCA. "Child abuse or neglect" means:

> (i) actual harm to a child's health or welfare; or

> (ii) substantial risk of harm to a child's health or welfare.

> Section 41-3-102(7)(a), MCA.

¶11 C.T. argues that the District Court should have denied the petition for TIA at the outset because DPHHS's report to the court in conjunction with the petition was insufficient on its face. The TIA petition was filed pursuant to § 41-3-402, MCA, which provides, in pertinent part, that

> (2) A petition for temporary investigative authority and protective services must state the specific authority requested and the facts establishing probable cause that a youth is abused or neglected or is in danger of being abused or neglected.

(3) The petition for temporary investigative authority and protective services must be supported by an affidavit signed by the county attorney, the attorney general, or an attorney hired by the county or must be supported by a [DPHHS] report stating in detail the facts upon which the request is based. The petition, affidavit, or report of [DPHHS] must contain information regarding statements, if any, made by the parents detailing the parents' statement of the facts of the case.

C.T. contends that the DPHHS report failed to meet the statutory requirements because it contained no allegations that D.T.H. had been abused or neglected.

¶12 The report required by § 41-3-402(3), MCA, need only set forth in detail facts supporting the petition's request for TIA based on the assertion that a child is abused or neglected or is in danger of being abused or neglected. Here, the DPHHS's report set forth the facts that C.T. conceived D.T.H. when she was fifteen years old; the child's father is C.T.'s then-stepfather D.H.; C.T. continues to reside in the same household as D.H. and plans to continue their relationship; she did not believe there was anything wrong about her relationship with D.H.; her mother, M.H., approved of C.T.'s relationship with D.H.; and C.T. had been sexually abused in the past by her natural father. Furthermore, the report set forth statements made by both C.T. and M.H. regarding the facts of the case. We conclude that DPHHS's report to the court set forth sufficient facts to support the petition's allegation that D.T.H. was in danger of being abused or neglected and, therefore, it meets the requirements set forth in § 41-3-402(3), MCA.

¶13 C.T. next argues that DPHHS failed to present sufficient evidence at the show cause hearing to support a determination that D.T.H. was a youth in need of care. In this regard, she points to Blackburn's testimony that there was no indication D.T.H. had suffered actual abuse or neglect and he appeared to be well cared for. While C.T. is correct that DPHHS presented no evidence establishing abuse or neglect as a result of any actual harm to D.T.H., § 41-3-102(7)(a)(ii), MCA, provides that abuse or neglect may be found where there is a substantial risk of harm to a child's health or welfare. In that regard, Blackburn testified that D.H.'s sexual relationship with C.T. raised the issue of whether he was inclined to commit sexual offenses against children and that, until he completed a sexual offender evaluation, there was concern he may sexually abuse D.T.H. Blackburn further testified that, in addition to the relationship with D.H., C.T. had been sexually abused by her natural father. According to Blackburn, these experiences, combined with C.T.'s inability to recognize any impropriety in her sexual relationship with D.H., raised concerns about her ability to adequately parent D.T.H. and protect him from harm.

¶14 Blackburn's testimony is sufficient to support a finding that there was a substantial risk of harm to D.T.H.'s health or welfare if he were returned to C.T.'s custody, thus making him an abused or neglected youth as defined in § 41-3-102(3) and (7), MCA. Consequently, we conclude that the District Court's post-hearing determination that D.T.H. was a youth in need of care as defined in § 41-3-102(23), MCA, is correct.

¶15 C.T. also argues that the District Court erred in denying her subsequent motion to dismiss the TIA. She notes that, in support of her motion to dismiss, she submitted a psychosexual evaluation of D.H. which stated that he "does not appear to pose a significant risk to sexually abuse his male child . . . ." She asserts that, based on this evaluation, the District Court should have determined that D.T.H. was not at risk of suffering harm while in her custody and, therefore, was not a youth in need of care.

¶16 At the hearing on the motion to dismiss, DPHHS presented the testimony of Michael Sullivan (Sullivan), the licensed clinical social worker who conducted the psychosexual evaluation of D.H. Sullivan testified that, notwithstanding his statement in the evaluation that D.H. did not appear to pose a risk of sexually abusing D.T.H., he determined D.H. could be classified as an untreated sex offender and should not have access to any children--including D.T.H. and C.T.--until he had enrolled and started to show progress in a treatment program for sex offenders. Sullivan further testified that C.T.'s relationship with D.H. was unhealthy and that the family unit exhibited extremely poor boundaries, which he defined as the parameters which provide guidelines within which people must operate in all aspects of their lives. He stated that these boundaries are important to a child because they serve as the basis for future relationships in their lives and that neither C.T. nor D.H. could provide D.T.H. with good boundaries until they had completed intensive treatment.

¶17 Sullivan also testified that C.T. had obvious psychological damage from being sexually abused by her father and, until she received treatment for this, she would be unable to set appropriate boundaries or make good decisions for D.T.H. He stated that C.T. is completely dependent on D.H. and has a high level of denial which results in an inability to perceive risk of harm to herself or her child. Sullivan further testified that, without successful treatment, C.T. would be unable to understand the risk of harm her relationship with D.H. poses to D.T.H.

¶18 The District Court entered extensive findings of fact in support of its order denying C.T.'s motion to dismiss which included findings based on Sullivan's testimony as outlined

above. The court then found that D.T.H. "has little hope of a normal emotional, moral, and psychological development with his parents under current circumstances" and concluded that returning D.T.H. to C.T.'s care would place him at substantial risk of harm. On this basis, the court determined D.T.H. continued to be a youth in need of care, denied C.T.'s motion to dismiss and granted DPHHS's motion to extend the TIA.

¶19 Based on our review of the record, we conclude that the District Court's findings of fact are supported by substantial evidence and are not otherwise clearly erroneous. Its conclusions of law based on those findings are correct. As a result, we hold that the court did not err in adjudicating D.T.H. a youth in need of care.

¶20 Finally, C.T. argues that the District Court should have granted M.H.'s motion to dismiss the TIA regarding C.T. and its failure to do so resulted in the submission of evidence at the later termination hearing which was not relevant to whether D.T.H. was at risk of suffering harm at the hands of his parents. C.T. fails to set forth what evidence may have been improperly admitted, however, or how that evidence resulted in any prejudice to her. We conclude C.T. has failed to establish that the District Court erred by allowing improper or irrelevant evidence.

¶21 Affirmed.

/S/ KARLA M. GRAY

We concur:

/S/ JIM REGNIER

/S/ JAMES C. NELSON

/S/ W. WILLIAM LEAPHART

Justice Terry N. Trieweiler dissents.

¶22 I dissent from the majority opinion.

¶23 While the District Court and the majority can breath easier tonight having vindicated their sense of morality by the termination of this unfortunate young mother's rights to her child, it is regrettable that this satisfaction comes at the expense of our Constitution and

statutory law.

¶24 We have repeatedly held that a parent has a fundamental liberty interest in the right to parent his or her child. In *In re J.L.* (1996), 277 Mont. 284, 288, 922 P.2d 459, 461. That expression is not superficial legalese with which we simply predicate each opinion in which we affirm the termination of parental rights. It expresses the principle that few things are as important to a civilized society as the bond between parent and child and that regardless of our own personal morality and beliefs, it cannot be severed absent a compelling state interest. Demonstration of a compelling state interest under our statutory scheme of law requires demonstration that the child has been abandoned, neglected or abused. None were demonstrated before D.T.H. was taken by the government from his mother's care at a time when he was less than two months old.

¶25 The District Court terminated Cora's parental right to her son pursuant to § 41-3-609 (1)(f), MCA, which requires that the child be first adjudicated a youth in need of care. A lawful determination that the child was in fact a youth in need of care was a jurisdictional pre-requisite to the termination of Cora's parental rights. *In Matter of J.B.* (1996), 278 Mont. 160, 923 P.2d 1096. A "youth in need of care" is someone who has been abused or neglected. Section 41-3-102(23), MCA. "Child abuse or neglect" requires proof of actual harm to a child's health or welfare or substantial risk of harm to a child's health or welfare. Section 41-3-102(7)(a)(i)(ii).

¶26 Here, there was no evidence at the time that this child was snatched from his mother's custody nor at the time the district court determined that he was youth in need of care that he had ever been "abused or neglected." The only evidence that he was at substantial risk of harm was the State's theory that his mother, herself, had been abused and was untreated for the consequences of that abuse, therefore, her son must be at risk for abuse. That is simply not enough to terminate this mother's fundamental liberty interest in her parent/ child relationship.

¶27 The dangerous precedent being set by the District Court's actions and the majority's approval are best illustrated by a closer examination of the record.

¶28 Before the Department of Public Health and Human Services can remove a child from his home, it has an obligation to conduct a thorough investigation of any reported abuse or neglect. A child cannot be removed from his home without independently developed evidence of abuse or neglect. Section 41-3-202(1) and (2), MCA. Following removal of a

child from his home, if the Department wishes temporary investigative authority, it must file a petition supported by an affidavit or department report stating in detail the facts upon which the request is based. The report accompanying the Department's petition in this case relates that the husband of Cora's mother is the father of Cora's child and has given her tattoos since the delivery of that child. There are also numerous allegations that Cora had been periodically neglected by her mother and stepfather. Finally, it was reported that as a child, Cora had been sexually abused by her natural father. There was, however, no documentation nor even any allegation that Cora's son Damian had been abused or neglected. Nevertheless, the District Court, on March 29, 1999, issued its order granting the Department temporary investigative authority and protective services. Cora was ordered to appear on April 13, 1999, for the hearing at which the court was to further consider the Department's petition.

¶29 At the April 13 hearing, Sara Blackburn, a social worker for the Department who authored the Department's report in support of its petition, was called as a witness. She expressed her legal conclusion that Damian was abused or neglected or in danger of being abused or neglected but offered no evidence in support of that conclusion. She stated that she placed D.T.H. in a foster home on March 17 but that he was in good condition at that time, he was clean and he appeared to be well fed. When asked to explain why she believed Damian was at risk of abuse or neglect if left in the custody of his mother, she answered that "Well, certainly because of the circumstances of his conception. This is of great concern to me, a relationship between a young girl and her stepfather . . . ." When asked if she had any other relevant information, she mentioned only Cora's tattoos.

¶30 On cross examination, Blackburn gave the following testimony.

"Q. On March 17 your report says you removed the infant from Cora's care in order to insure safety during this investigation, correct?

A. Yes.

Q. You testified that when you went to the home of Cora and Don and Martha and you took the child -

A. No, I didn't go to the home.

Q. Who went to the home?

A. Nobody did.

Q. How did you get physical possession of the child?

A. I removed the baby from Deering Clinic. They were at an appointment there.

Q. You went to the Deering Clinic and took the child?

A. Yes.

Q. And at that time the baby, according to your prior testimony, was healthy?

A. Yes.

. . .

Q. Did not have any marks upon him?

A. No.

Q. Was not in any way abused, the baby?

A. No.

Q. Not neglected?

A. No.

Q. Well cared for?

A. Appeared to be.

. . .

Q. What abuse of the baby did you observe prior, or did you know about prior to your placement of the baby in foster care?

A. I did not observe any abuse to the baby at that time.

Q. And any neglect of the baby by Cora?

A. No.

. . .

Q. Where Damian is concerned, what evidence exists that the baby was not safe in that home on that date, or before that date?

A. I believe that, given the history of his conception, that that was of grave concern to us and that certainly we needed to look into that in order to insure his safety.

Q. How does conception of a child occurring, I guess at 13 months prior in time to the conception, the act of conception of that child, means this child is being abused or neglected?

A. It didn't mean that. It meant that I believe Cora was.

Q. Would you agree with me Damian is not abused or neglected?

[County Attorney Objects.]

THE COURT: Well, bottom line, I guess this witness has already answered there was no abuse or neglect of the baby, so I guess I'm going to sustain on the basis that it's been asked and answered.

¶31 No other evidence was presented at the conclusion of the hearing. Damian's guardian ad litem recommended that he and his mother be together. She said that based on her observations of the child and mother together, Cora cared for him well. Her only concern was that there be a sex offender evaluation of the father. She made the following relevant observation:

As I started to say, I spent several hours with them yesterday at their residence. I saw no significant problems at the residence they are currently renting. They have adequate transportation as well. Obviously Cora has put some time and thought and effort in for providing for this little guy. He has his own room, own crib, everything

nicely taken care of. Nicely decorated. It really breaks my heart to see she is not with him at this time, but yet I really think that placement needs to be in foster care with her.

¶32 Cora's guardian ad litem, who had also done some investigation, made the following comments to the court:

> I also understand that Cora has, for a 16 year old girl, has some good parenting skills. No concerns have been voiced by any of the people who has watched her. She has indicated that she - that Damian is central to her life. She wants to be with Damian.
>
> . . .
>
> I also think that Damian and Cora being together would also be in Cora's best interest. I know Cora intimated that she will do everything the Department wants of her.
>
> Based on that, I would recommend that there be some involvement regarding Cora. Obviously there hasn't been any abuse or neglect voiced today regarding Damian.

¶33 The Department's failure to prove that Damian was abused or neglected and therefore, in need of care, was evident to the District Court at the conclusion of the April 13 hearing. While the District Court expressed concerns with regard to the natural father's behavior toward Cora, it also recognized the following:

> The concern with the case is that there is no evidence that Damian has been abused or neglected, and, in fact, there is evidence that he is well-cared for, so what I'm going to do is not grant the petition as to Damian, and order that Damian be taken on this proceeding, and it be dismissed as to Damian. I have looked at the law. I don't think there is any alternative. I don't think there has been proof in front of me Damian has been abused or neglected.
>
> In other words, I think there is proof in front of me [Cora] has been abused or neglected . . . .
>
> . . .

So, unfortunately, I just don't think, under the law, that I can keep Damian in this case. I think there has to be a preponderance of the evidence of abuse or neglect - danger, abuse or neglect. Doesn't seem to be any here.

¶34 However, after protestations by Damian's guardian ad litem over the court's refusal to place Cora in foster care, the district court agreed to allow further briefing followed by an additional hearing one week from that date. Then, even though no additional briefing was provided, the district court decided, contrary to everything that had been demonstrated at the previous hearing, that Damian was in danger of abuse or neglect. Therefore, on April 20, 1999, the District Court continued the order of temporary investigative authority.

¶35 The District Court was correct in its original decision on April 13, 1999. It erred when it reversed itself on April 20, 1999, and it erred when it terminated Cora's parental rights based on her failure to complete a treatment program which had never been proven necessary by any evidence of abuse, neglect or substantial risk of abuse or neglect. The District Court's lengthy discussion of Cora's failure to satisfactorily complete her treatment plan misses the point. The State had no authority to impose a treatment plan. A treatment plan can only be required of parents whose children are in need of care. There was no evidence that Damian was in need of care.

¶36 The only remote suggestion of any threat to Damian is the fact that his mother was abused by a person with whom she was still living. However, when that person was evaluated for the potential threat he might pose to Cora's son, the evaluator concluded there did not appear to be any sexual attraction to young male children. Although the evaluator considered his relationship with Cora inappropriate, he concluded that "Mr. Howard does not appear to pose a significant risk to sexually abuse his male child, . . . ." All of Sullivan's added advice about boundaries within the family is interesting from a family counseling point of view but did nothing to establish a risk of abuse or neglect of Damian. In spite of this evaluation, however, the District Court refused to return the child to his mother and terminate temporary investigative authority.

¶37 In its findings which served as the basis for its termination of Cora's parental right, the District Court demonstrated no abuse nor neglect of Damian. The essence of its opinion was that Cora had been abused her by father and stepfather and lived in an unhealthy, dysfunctional lifestyle which was no place for a helpless infant. Basing its decision on morality rather than law, the District Court stated:

The parents here, lacking a necessary moral environment are not in a position to provide proper guidance for this infant's necessary moral and emotional well-being.

¶38 Nowhere in our laws regarding termination of parental rights does it provide for termination based upon some district judge's determination that the child's parents are not in a position to provide proper guidance for what the district court determines is the child's necessary moral well-being. Up until now, we have never had morality police in Montana.

¶39 The rationale of the District Court and the majority is that because Cora was abused by her stepfather and her father and is untreated for that abuse, her child is at risk for abuse or neglect. While the record is replete with evidence of Cora's victimization, that is not the issue. Until now, the law has never provided that if you have been a victim of abuse, you cannot have children. Think of the opportunities this case creates for the Department and foster homes of this state. A whole generation of victims could lose children because of the previous generation's offenses. The District Court's decision and the majority's approval of that decision are based on unfounded speculation. As long as gross speculation is the order of the day, my speculation is that there are many untreated victims of abuse in this state who are raising children without any problem. They should be left alone by the State to do so. However, as a result of this decision, the sanctity of their parent-child relationships are a little less certain. This case expands greatly the circumstances under which the State can interject itself into private lives. Parental rights can now be terminated based on the Department's and some district judges' notions of immorality. Let's hope they never differ from our own.

¶40 Cora was victimized by her father and stepfather. She has now been victimized by social workers and courts.

¶41 For these reasons, I dissent from the majority opinion.

/S/ TERRY N. TRIEWEILER