No. 03-499

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 61

IN THE MATTER OF
B.F. and A.W.,

     Protected Minors.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone, Cause Nos. DG 00-65 & DN 00-33
The Honorable Gregory R. Todd, Judge presiding.

COUNSEL OF RECORD:

     For Appellant:

          Kellie M. Gaston, Gaston Law Firm, Billings, Montana; Herbert I. Pierce III,
Crowley Haughey Hanson Toole & Dietrich, Billings, Montana

     For Respondent:

          Jill Deann LaRance and Kathryn S. Syth, LaRance, Syth & Associates, P.C.,
Billings, Montana

Submitted on Briefs:  February 17, 2004

Decided:   March 16, 2004

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 The Thirteenth Judicial District Court, Yellowstone County, set aside a guardianship decree based upon S.W.'s allegation that the purported fathers were not properly noticed of the guardianship proceeding. The guardians, whose custodial rights were terminated as a result of the decree being set aside, appeal. We reverse and remand.

**ISSUE**

¶2 Restated, the dispositive issue before this Court is whether S.W. had standing to challenge the guardianship decree on behalf of the purported fathers.

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3 S.W. is the biological mother of two daughters, B.F. and A.W. B.F. was born in December 1991, and A.W. was born in November 1996. Both children were born in Texas but by mid-1999 were living in Billings, Montana. The children have different fathers, and the record indicates that the children have had virtually no contact with their fathers since birth.

¶4 In July 1999, S.W., who was struggling with severe drug addiction and alcoholism at the time, asked the children's godparents and future foster parents, J.N. and A.N., to care for the children, ostensibly for a weekend. S.W.'s problems, however, prevented her from returning for them at the weekend's conclusion, and the children remained with J.N. and A.N. (hereinafter "Foster Parents") for several weeks. In late July, S.W. signed a notarized statement giving the Foster Parents temporary custody of the girls while she sought treatment

at a drug rehabilitation facility. The facility contacted the Montana Department of Public Health and Human Services (DPHHS or the Department) when, after only twenty-four hours, S.W. discharged herself from the hospital against medical advice. DPHHS contacted S.W. and learned of her extensive drug and alcohol-related history. S.W. agreed to leave the children with the Foster Parents and seek treatment.

¶5 Successful treatment eluded her, however, and in November 1999, S.W. was still using drugs, was incarcerated for traffic violations, and was facing additional criminal charges of prescription falsification and writing bad checks. DPHHS filed a Petition for Temporary Investigative Authority and Emergency Protective Services (TIA). The children continued living with the Foster Parents during this time.

¶6 In March 2000, DPHHS filed a Petition for Temporary Legal Custody (TLC). In the Petition, DPHHS identified B.F.'s purported father as S.E., and A.W.'s purported father as M.T.A. The addresses of neither man were known or found. The Thirteenth Judicial District Court granted DPHHS temporary custody in June 2000. The Foster Parents promptly sought to be appointed as guardians, and S.W. willingly executed affidavits declaring that her daughters' best interests would be served by suspending her parental rights and appointing the Foster Parents as guardians. In their Petition for Appointment of Guardianship, the Foster Parents declared that "[B.F.'s] father is unknown. [A.W.'s] father is M.T.A. . . . [whose] address is unknown. The Child and Family Services Division of the Department of Public Health and Human Services attempted to locate [M.T.A.] without success." This information was derived directly from S.W.'s affidavits that were attached to the Petition.

¶7 In September 2000, the Thirteenth Judicial District Court entered its Order appointing the Foster Parents as permanent guardians, and granting S.W. visitation rights as agreed upon by the parties and as recommended by the children's counselor. In its Order, the court repeated the Foster Parents' and S.W.'s declarations regarding the identities of the biological fathers and the unknown location of A.W.'s father. The District Court also made the Foster Parents responsible for notifying DPHHS if S.W. attempted to revoke the guardianship.

¶8 In October 2000, in light of the guardianship, DPHHS moved to terminate the Department's temporary legal custody of the girls. The court promptly ordered dismissal of the TLC. In DPHHS' Affidavit of Dismissal attached to the Order, DPHHS indicated that the girls were to remain with the Foster Parents until the age of eighteen.

¶9 In early 2001, the children and S.W. began monthly visitations. A.W.'s posttraumatic stress disorder symptoms immediately returned and became increasingly stronger during the three or four visits she had with her mother. Additionally, B.F.'s serious anxiety symptoms returned as well. As a result, three or four months after visitation began, A.W.'s counselor and psychiatrist recommended that visits with S.W. cease for at least several months. Visits with B.F. were suspended at that time as well.

¶10 In April 2002, S.W. filed a Petition for Termination of Guardianship, maintaining that she had addressed the issues that resulted in the establishment of the guardianship and was in a position to parent her daughters. In May 2002, the State filed a Petition for Emergency Protective Services and Temporary Investigative Authority in which it opined that the

4

children should remain in the Foster Parents' home. In this TIA, the State identified B.F.'s father as S.E.

¶11     In June 2002, the Foster Parents filed a Motion to Dismiss S.W.'s termination petition, pending the outcome of the 2002 TIA hearing. Shortly thereafter, the Thirteenth Judicial District Court held a hearing on the State's TIA. The court noted in its Order that the biological fathers of the children were unable to be served personally as their whereabouts were unknown. As a result, the fathers were not present. The District Court adjudicated the girls to be "youths in need of care," and transferred temporary legal custody of them to DPHHS. The children remained with the Foster Parents. However, the court denied the Foster Parents' motion requesting dismissal of S.W.'s petition to terminate the guardianship. Based on testimony at the hearing, the Foster Parents believed that the State intended to leave the girls with them pursuant to their status as permanent guardians; therefore, they did not object to or challenge the 2002 TIA or TLC. The children remained with the Foster Parents as this proceeding progressed.

¶12     A hearing on S.W.'s Petition to Terminate Guardianship was scheduled for April 28, 2003. On April 23, 2003, S.W. filed a Motion to Set Aside the Guardianship Decree on the grounds that the purported fathers had not received notice of the proceedings. She argued that the names of the purported biological fathers, S.E. and M.T.A., were included in DPHHS's March 2000 Petition for Temporary Legal Custody, and maintained that because the Foster Parents failed to list the names of these men in the statutorily-required published notice associated with their Petition for Guardianship in July 2000, the District Court lacked

5

subject matter jurisdiction to grant the guardianship petition. The Foster Parents countered that it was S.W. herself who declared in affidavits attached to their Petition for Guardianship and consenting to their appointment as Foster Parents, that she did not know who B.F.'s father was and that she had no knowledge of M.T.A.'s then-current residence.

¶13 The District Court granted S.W.'s Motion to Set Aside, resulting in the termination of the Foster Parents' guardianship, apparently concluding that the lack of actual notice to the purported fathers rendered the proceedings defective. The hearing on the Petition to Terminate Guardianship was cancelled. After four years in the Foster Parents' home, the girls were removed and placed in temporary foster care. B.F. and A.W. were subsequently returned to S.W.'s full time care on October 30, 2003.

¶14 The Foster Parents appeal. They argue, among other things, that S.W. does not have standing to raise objections on behalf of the purported fathers' due process rights.

## DISCUSSION

¶15 Standing to sue refers to a "party's right to make a legal claim or seek judicial enforcement of a duty or right." Black's Law Dictionary, Seventh Edition. "A threshold requirement of every case is that a party have standing to bring the action. A party has no standing when there is no personal stake in the outcome of the controversy. The mere fact that a person is entitled to bring an action under a given statute is insufficient to establish standing; the party must allege some past, present or threatened injury which would be alleviated by successfully maintaining the action." *Matter of Paternity of Vainio* (1997) 284 Mont. 229, 235, 943 P.2d 1282, 1286 (internal citations omitted).

6

¶16     In the case before us, S.W. claims that the Foster Parents' failed to comply with the statute dictating the manner in which notice is to be given in guardianship proceedings. She asserts that as a result of such failure the due process rights of the purported biological fathers were violated. We note, however, that S.W. herself had full notice of the guardianship proceeding, actively participated in it, and provided the Foster Parents with the identity, or lack of identity, of the purported fathers. Therefore, regardless of whether or not the Foster Parents fully complied with the notice statute, S.W.'s rights were not compromised nor was she injured by any alleged statutory violation. Since the general rule is that "a litigant may only assert his own constitutional rights or immunities," we hold that S.W. does not have standing to assert  violation of the purported fathers' due process rights. *McGowan v. Maryland* (1961), 366 U.S. 420, 429, 81 S.Ct. 1101, 1107, 6 L.Ed.2d 393, 401. Thus even if the statute was violated, S.W. suffered no detriment or injury as a result.

¶17     S.W. maintains that the violation of the notice statute deprived the District Court of subject matter jurisdiction, and because a challenge to subject matter jurisdiction may be raised by anyone at any time, her motion has merit. The Foster Parents claim that they fully complied with the applicable notice statute, § 72-1-301(1), MCA. In the alternative, they argue that, even if the statute was violated, such failure would have resulted in the court having no personal jurisdiction over the purported fathers, not a deprivation of subject matter jurisdiction.

¶18     Subject matter jurisdiction is simply the power of the court to hear and adjudicate the claim before it. Personal jurisdiction, on the other hand, is the court's ability to exercise that

7

power over particular individuals. Black's Law Dictionary, Seventh Edition. Lack of personal jurisdiction does not deprive the court of subject matter jurisdiction. *See Application of Gault* (1967), 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527; *In Interest of L.E.J.* (Ill. 1983), 451 N.E.2d 289.

¶19    The District Court has statutory subject matter jurisdiction over the guardianship proceeding. Section 72-1-202(1)(b), MCA, states "[t]o the full extent permitted by the constitution, the court has jurisdiction over all subject matter relating to protection of minors and incapacitated persons." Moreover, § 72-1-301(1), MCA, does not provide that failure to comply with the notice requirements eradicates the court's jurisdiction. Any alleged failure to comply with the notice statute would have resulted in lack of personal jurisdiction over the purported fathers. Again, this is not a claim that S.W. has standing to bring.

¶20    Because we conclude the District Court had subject matter jurisdiction to proceed in the guardianship matter and that S.W. did not have standing to challenge the proceeding on behalf of the purported fathers, the District Court erred in setting aside the decree of guardianship on the basis of deficient notice to the children's purported fathers.

## CONCLUSION

¶21    For the foregoing reasons, we reverse the District Court and remand for further proceedings consistent with this Opinion.  On remand, the District Court shall take into consideration the circumstances of the parties and the children as they exist at the time of the remand proceeding.

/S/ PATRICIA O. COTTER

We Concur:

/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER
/S/ JIM RICE