DA 25-0146

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 272

IN THE MATTER OF:

C.M.B.,

      A Youth in Need of Care.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DN-23-51
Honorable Jason T. Marks, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Kelli S. Sather, Kelli S. Sather, PLLC, Missoula, Montana

      For Appellee:

      Austin Knudsen, Montana Attorney General, Roy Brown, Assistant
Attorney General, Helena, Montana

      Matthew Jennings, Missoula County Attorney, Julie Brown, Deputy
County Attorney, Missoula, Montana

Submitted on Briefs:  September 10, 2025

Decided:  November 25, 2025

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 T.C. (Mother) appeals from the Order Terminating Parental Rights and Granting Permanent Legal Custody, entered by the Fourth Judicial District Court, Missoula County. We consider:

1. *Whether Mother has standing to assert a claim that C.M.B.'s counsel rendered ineffective assistance to C.M.B. at the termination hearing.*

2. *Whether the District Court abused its discretion by terminating Mother's parental rights to C.M.B. without adequately considering C.M.B.'s mental condition and finding it was unlikely Mother's condition would change within a reasonable time.*

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 C.M.B. was born in October 2018 to Mother and J.B. (Father). On May 10, 2023, Child and Family Services (CFS, Department, or State) received a report relaying concerns about potential abuse or neglect of C.M.B. The basis for this report was the frequent presence of law enforcement at Mother's home in previous months and the events that occurred on May 10, 2023. According to the CFS affidavit in support of a petition for emergency protective services, law enforcement had frequently visited the house in response to neighbors making calls after hearing loud sounds of apparent fighting and domestic violence within the home.

¶3 In the early morning hours on May 10, 2023, the police responded to the house after receiving a call at 5:40 a.m. from one of C.M.B.'s older half siblings, who reported that Mother was screaming and making sounds of pain. When police arrived, they located Mother outside the home. She was bleeding from her right eye but was uncooperative with

2

police and would not explain how she had been injured. Mother refused to admit the officers into the home, but, believing that Jose Mosqueda, Mother's boyfriend, was armed and in the home with the children, police entered. Officers found the house empty except for three children, including C.M.B. and her two older half siblings. The house was unsanitary. Mother remained uncooperative throughout the encounter and appeared to police to be more anxious to protect Mosqueda than afraid of him.

¶4     Between 2017 and 2023, prior to the above-described events, approximately 20 reports had been received by CFS regarding the children's safety, relaying concerns about substance abuse, mental health, and domestic violence. In 2017, Mother was arrested and charged with stabbing Father while they were in the presence of the children. A prior petition for emergency protective services (EPS) and temporary legal custody (TLC) was granted in 2022 and the children remained in the Department's custody until the petition was dismissed a year later. The District Court took judicial notice of that proceeding. Unknown to the Department at the time of dismissal, Mother had then been charged with several felony offenses arising out of her involvement in a robbery in October 2022.

¶5     On May 11, 2023, Child Protection Specialists (CPS) Houlihan and Sanders met with mother to discuss the report of neglect and abuse. Mother advised that she struggled with post-traumatic stress disorder (PTSD), including night terrors. She assured CPS that, while she and Mosqueda had verbal disagreements, no violence had occurred in the home, and she provided various other reasons for her facial injury. CPS Houlihan and Sanders spoke with C.M.B., who stated that Mother and Mosqueda often hit each other, and said the hitting was both open and closed fisted. She described her siblings and Mother as being

3

safe, but Mosqueda as unsafe. CFS determined that C.M.B. and her siblings needed to be removed from Mother's care, and placed C.M.B. and her two half siblings into a kinship placement.

¶6 The Department again petitioned for EPS, for adjudication of C.M.B. as a youth in need of care (YINC), and for TLC for six months. Shannon Hathaway was appointed as legal counsel for C.M.B. and attended all hearings and meetings throughout the proceeding, either in person or by a representative. Court Appointed Special Advocate (CASA) Lauren Pierce assisted C.M.B. throughout the proceeding. Mother stipulated to the petition, and on June 26, 2023, the District Court adjudicated C.M.B. as a YINC, concluding, "[t]he child's removal was necessary because continuation in the home would be contrary to the welfare of the child, and an out-of-home placement is in the best interests of the child . . . ."

¶7 Shortly after their removal, C.M.B.'s two older siblings moved in with their biological father in Eastern Montana. The Department placed C.M.B. in a non-kinship foster care placement. Mother was unable to personally attend all hearings due to detention related to her ongoing criminal proceeding. Mother initially maintained her scheduled visits with C.M.B., but could not continue them after she was detained for a violation of release conditions, specifically, failing an urinalysis (UA).

¶8 At the June 26, 2023 hearing, CFS indicated an intention to move C.M.B. to a foster care home near Sidney to be closer to her half siblings. Mother signed on to the treatment plan prepared by the Department at a hearing on July 11, 2023, and, in October, the District Court dismissed the Department's proceeding with regard to C.M.B.'s older siblings, as they had moved in permanently with their Father. In December 2023, the Department

4

requested an extension of TLC of C.M.B. through June 26, 2024. Mother, present at the hearing on the request, did not object, but raised concerns about maintaining her housing. At a status conference on March 5, 2024, CPS reported that Mother had missed several visits with C.M.B. and had not met with her CPS to discuss the case. Mother reportedly was then living in her car, but was pursuing other housing options. At the hearing, CFS discussed the possibility of placing C.M.B. in a kinship placement in California.

¶9 At a hearing on June 25, 2024, to consider the Department's request for an extension of TLC for an additional three months, CFS reported that placement of C.M.B. with family in California had fallen through. The CPS related that Mother felt demoralized by the prospect of C.M.B. being placed with out-of-state family and had withdrawn from participation in the treatment plan. Mother stated she wanted C.M.B. placed back in her care. Hathaway expressed concerns that C.M.B. seemed to be struggling in foster care, offering, "I think the kind of abrupt absence of her mom was very difficult and not having that contact anymore." Hathaway encouraged the Department to continue efforts to place C.M.B. with her siblings and the siblings' father, stating "I think it would be great if [C.M.B.] could be with her siblings." At this time, CFS expressed concerns about the time frame, as the lengthy time C.M.B. had resided in foster care could lead to a petition for termination of parental rights amidst concerns that Mother was not making sufficient progress for reunification.

¶10 In September 2024, the Department filed a petition for the termination of Mother's and Father's parental rights pursuant to § 41-3-609(1)(f), MCA, asserting Mother had not complied with the treatment plan, was unlikely to change within a reasonable time, and

5

"[t]he child ha[d] been in out-of-home foster care under the physical custody of the state since May 11, [2023] . . . over 15 of the most recent 22 months and the best interests of the child must be presumed to be served by termination of parental rights pursuant to Mont. Code Ann. 41-3-604(1)." The petition stated that Mother had in-person visits with C.M.B. at the start of the case but those were ended "due to cancellations and lack of consistency" on Mother's part. Further, Mother allegedly did not engage with CFS regarding her treatment plan goals. C.M.B.'s Father had participated in some phone and in-person visits with C.M.B., but had been incarcerated or in a treatment center for virtually the entirety of the case. He signed a consent to adoption and relinquishment of parental rights to C.M.B.

¶11 Numerous witnesses for both sides testified at the termination hearing conducted in December 2024. C.M.B.'s therapist testified that she had diagnosed C.M.B. with PTSD and generalized anxiety disorder. She related that playtime therapy with dolls was "borderline scary" because of the attributes C.M.B. assigned to the parent doll. The therapist opined that C.M.B., while concerned about Mother, did not trust Mother because Mother did not "show up for her," and that she would benefit from more consistency and permanency regarding her future placement. Mother's probation officer testified that Mother's compliance on her suspended sentence was "not good," because she used illegal drugs, missed UAs, and failed to maintain employment. CPS Pickett testified regarding the history of Mother's involvement with the Department, her substantial failure to engage with the treatment plan in this case, and Mother's continuing substance abuse. She opined that Mother struggled to care for her own needs, did not demonstrate the capacity to care for C.M.B.'s needs, and did not appear to be able to actively engage in "sustained change."

6

C.M.B. had been residing with a family near Sidney, was able to have contact with her siblings, and had begun the process of grieving and accepting the loss of Mother. For Mother, a behavioral health peer support specialist with Recovery Centers of Montana reported that Mother often completed more hours per week than the program required of her, and had taken on a leadership role among her peers. Mother's grandmother testified to the bond between Mother and C.M.B., and a family support resource specialist at Healthy Foundations reported that Mother interacted well with C.M.B. In response to questioning from Mother's attorney, an administrator at Ignatia's House Sober Living opined that, given enough time, Mother might be able to get a placement at the home that would include C.M.B. C.M.B.'s sister testified that she had only seen C.M.B. twice since they had been placed in different homes, and that C.M.B. had told her she did not want to be adopted. Hathaway filed a notice of joining with the Department's proposed findings of fact and conclusions of law, explaining that she was doing so under a "substituted judgment theory" in light of C.M.B.'s diminished capacity as a minor to understand the proceeding, and reasoning that Mother had "not demonstrated she is able to maintain sobriety and stability for the long term" such as to prevent C.M.B. from again returning to the CFS system. Hathaway actively questioned most of the witnesses who testified at the termination hearing.

¶12     In its Order Terminating Parental Rights and Granting Permanent Legal Custody, the District Court noted there was "an extensive record to guide its determination." It found that Mother "did not provide [C.M.B.] with a safe and stable home" while C.M.B. was in her care, that Mother's long absences "had a huge impact on [C.M.B.'s] well-being," that

7

Mother's engagement with the treatment plan was minimal and she had not taken accountability for her role in C.M.B.'s removal, and that Mother's conditions rendered her unable to care for C.M.B. which were unlikely to change, citing numerous factors, including excessive use of intoxicants; Mother's own emotional and mental illnesses and disorders; her failure to have "yet engaged in intensive and targeted mental health therapy to address her own significant trauma"; her criminal behaviors; and her chronic inability to keep C.M.B. from unsafe people.  It thus terminated Mother's and Father's parental rights to C.M.B.

¶13    Mother appeals.

## STANDARD OF REVIEW

¶14    "The Due Process . . . Clause of the Montana Constitution (Article II, Section 17) provides a parent in a termination of parental rights proceeding with the right to the effective assistance of counsel." *In re A.D.B.*, 2013 MT 167, ¶ 64, 370 Mont. 422, 305 P.3d 739.  "Issues of justiciability, including standing, are questions of law which we review de novo." *In re R.N.*, 2024 MT 115, ¶ 8, 416 Mont. 462, 549 P.3d 452 (citing *Barrett v. State*, 2024 MT 86, ¶ 29, 416 Mont. 226, 547 P.3d 630).

¶15    We review for abuse of discretion, a district court's termination of parental rights. *In re M.D.M.*, 2002 MT 305, ¶ 12, 313 Mont. 51, 59 P.3d 1142.  The district court abused its discretion if it "acted arbitrarily, without employment of conscientious judgment, or exceeded the bounds of reason resulting in substantial injustice." *Matter of C.P.*, 2001 MT 187, ¶ 9, 306 Mont. 238, 32 P.3d 754 (internal quotation omitted).  We review, in YINC proceedings, findings of fact "to determine whether they are clearly erroneous." *In re A.R.*,

8

¶ 15, 326 Mont. 7, 107 P.3d 457 (citing *In re D.T.H.*, 2001 MT 138, ¶ 7, 305 Mont. 502, 29 P.3d 1003).  We conclude that a finding of fact is clearly erroneous if it lacks support from substantial credible evidence in the record, the district court misapplied the effect of the evidence, or our review of the record reveals that the district court made a mistake in its ruling.  *In re A.R.*, ¶ 15 (citing *In re D.T.H.*, ¶ 7).  Conclusions of law are reviewed to determine correctness.  *In re A.R.*, ¶ 15 (citing *In re D.T.H.*, ¶ 7).

## DISCUSSION

¶16    1. *Whether Mother has standing to assert a claim that C.M.B.'s counsel rendered ineffective assistance to C.M.B. at the termination hearing.*

¶17    Mother argues that C.M.B.'s counsel rendered ineffective assistance (IAC) to C.M.B., and thus violated C.M.B.'s statutory and constitutional rights to counsel, citing § 41-3-425(1) and (2)(b), MCA, by failing to advocate for C.M.B.'s express wishes to retain her relationship with Mother.  She contends that, contrary to Hathaway's invocation of the "substituted judgment" approach, C.M.B. "did not have diminished capacity and her counsel should not have substituted her judgement for C.M.B.'s expressed wishes, as this created a conflict which effectively violated C.M.B.'s right to counsel."  The Department responds that Mother does not have standing to raise this issue, noting that § 41-3-101(1)(e), MCA, provides that "a child is entitled to assert the child's constitutional rights," and Mother cannot assert another's rights, namely, C.M.B.'s statutory and constitutional rights to counsel.  In reply, Mother argues that "due to the fact that C.M.B.

9

is the subject matter of the proceeding, and Mother has her fundamental right to parent, Mother has standing to object to her child's right to counsel being violated."

¶18 "Standing is a person's right to make a legal claim or seek judicial enforcement of a duty or right." *F.H. v. C.P.H. (In re D.A.H.)*, 2005 MT 68, ¶ 8, 326 Mont. 296, 109 P.3d 247 (citing *Black's Law Dictionary*, 7th ed. 1999). "Standing is a doctrine involving justiciability and, as such, it is a threshold requirement in every case which we must address and decide *sua sponte* even if it is not raised by a litigant." *Dick Anderson Constr., Inc. v. Monroe Constr. Co., L.L.C.*, 2009 MT 416, ¶ 46, 353 Mont. 534, 221 P.3d 675. Standing requires the party to have a personal stake in the outcome of the controversy at the commencement of the litigation. *Heffernan v. Missoula City Council*, 2011 MT 91, ¶ 30, 360 Mont. 207, 255 P.3d 80 (citing *Greater Missoula Area Fed'n of Early Childhood Educators v. Child Start, Inc.*, 2009 MT 362, ¶ 23, 353 Mont. 201, 219 P.3d 881). A party must show a past, current, or endangered property or civil interest that could be remedied by the current proceeding. *Montana Env't Info. Ctr. v. Dep't of Env't Quality*, 1999 MT 248, ¶ 41, 296 Mont. 207, 988 P.2d 1236 (citing *Gryczan v. State,* 283 Mont. 433, 442-43, 942 P.2d 112, 118 (1997)). "[W]e have recognized the prudential rule that a litigant may only assert her own constitutional rights or immunities." *Heffernan*, ¶ 33; *Jones v. Mont. Univ. Sys.*, 2007 MT 82, ¶ 48, 337 Mont. 1, 155 P.3d 1247 ("'a litigant may only assert his own constitutional rights or immunities'") (quoting *In re B.F.*, 2004 MT 61, ¶ 16, 320 Mont. 261, 87 P.3d 427).

¶19 In *In re B.F.*, S.W., the biological mother of the two subject girls brought an action on behalf of her daughters' biological fathers against the girls' foster parents, alleging a

10

statutory and constitutional violation. *In re B.F.*, ¶ 16. S.W. contended that the fathers had not received proper notice as required by statute from the foster parents. We noted that S.W. herself had "full notice" of the proceeding, and that any alleged failure to comply with the notice statute would have resulted in a lack of personal jurisdiction over the girls' purported fathers, not S.W. *In re B.F.*, ¶ 16. We thus held that "regardless of whether or not the Foster Parents fully complied with the notice statute, S.W.'s rights were not compromised nor was she injured by any alleged statutory violation." *In re B.F.*, ¶ 16. Therefore, citing "the general rule" that a litigant may only assert her own constitutional rights or immunities, we concluded S.W. did not have standing to bring this challenge on behalf of her daughters' biological fathers' statutory and due process rights. *In re B.F.*, ¶¶ 16, 19.

¶20 Our decision in *In re K.H.*, 2012 MT 175, ¶ 29, 366 Mont. 18, 285 P.3d 474, lays the groundwork for resolution of the issues raised here. First, we rejected the contention of the mother of the two children subject to the YINC proceeding therein that the children were not parties to the proceeding, noting that they were listed as a party involved in the petition, who were entitled to appointment of counsel under § 41-3-425, MCA, and that § 41-3-101(1), MCA, recognized that a child was entitled "to assert the child's constitutional rights." *In re K.H.*, ¶ 25. Secondly, we rejected the mother's argument that only the children's guardian ad litem, and not the children themselves, may bring an appeal on behalf of the children, and held that the children, who were separately represented, could appeal the District Court's decision on their own. *In re K.H.*, ¶¶ 26-31. Lastly, we held that the children's attorney did not act outside of his representative capacity "by advocating

11

for their adjudication as youths in need of care despite the children's expressed desire to return to Mother's custody." *In re K.H.*, ¶ 31. We reasoned that, "while an attorney has a responsibility to pursue the lawful objectives of his client, this duty may be affected when 'a client's ability to make adequately considered decisions in connection with the representation is impaired . . . because of minority[.]'" *In re K.H.*, ¶ 29 (quoting *In re Marriage of Rolfe*, 216 Mont. 39, 51, 699 P.2d 79, 86 (1985) (internal citation omitted)).

¶21 Importantly, we have explained that the wishes of a child "deserve serious consideration." *Rolfe*, 216 Mont. at 52, 699 P.2d at 81. To that end, a child's counsel must inform the district court of the client's wishes that are, in the lawyer's opinion, contrary to the best interest of the child. *In re K.M.*, ¶ 29. Here, Hathaway, utilizing substituted judgment analysis, joined CFS's petition for termination of Mother's parental rights. According to her Notice of Joining with Child and Family Services Proposed Findings of Facts and Conclusions of Law, Hathaway based the use of this analysis on her client's age. Further, she pointed to Mother's lack of engagement and "criminal behavior and use of dangerous drugs while the Youth was in a trial home visit during the previous legal proceedings," to support her position that a prolonged child-parent relationship was not in the best interest of C.M.B.

¶22 Consequently, based upon these authorities, Mother has not shown a personal constitutional violation and a basis to assert C.M.B.'s statutory and constitutional rights to counsel. The application of this general prudential standing rule here is based upon the status of children within the proceeding and the provision for their representation, as discussed herein. As a prudential rule, it is possible that circumstances could arise,

12

including statutory revisions, which would possibly permit another to assert rights or immunities on behalf of the children. *See Heffernan*, ¶ 33 ("As for prudential requirements, we have observed that discretionary limits on the exercise of judicial power 'cannot be defined by hard and fast rules.'") (internal citation omitted). However, those circumstances are not present here, and we see no basis to depart from the application of this "general rule." *In re B.F.*, ¶ 16.

¶23  *2. Whether the District Court abused its discretion by terminating Mother's parental rights to C.M.B. without adequately considering C.M.B.'s mental condition and finding it was unlikely Mother's condition would change within a reasonable time.*

¶24  In determining whether, under statute, the conduct or condition of the parents is unlikely to change within a reasonable time, "the court shall enter a finding that continuation of the parent-child legal relationship will likely result in continued abuse or neglect or that the conduct or the condition of the parents renders the parents unfit, unable, or unwilling to give the child adequate parental care." Section 41-3-609(2), MCA. In making these determinations, the court is to consider a nonexclusive list of statutory factors, including the parents' emotional illness and mental illness, history of violent behavior, and excessive use of intoxicants. Section 41-3-609(2)(a)-(c), MCA.

¶25  Mother argues that the District Court erred by finding it was unlikely her condition would improve because the court failed to properly credit the progress she was making on her addictions and in preparing for C.M.B. to live with her. Further, she contends that C.M.B. was in a condition of "uncertainty and sadness because she wanted to be with her mother," which the District Court failed to consider. The State responds that the District

13

Court did not abuse its discretion by terminating Mother's parental rights and adequately weighed Mother's history of drug use, criminal history, and overall lack of stability, noting that "Mother's substantial failure at progress shows that Mother's conduct or condition is unlikely to change within a reasonable time."

¶26 The District Court's analysis of Mother's participation in the case and her deficits was lengthy and detailed. The District Court considered C.M.B.'s mental health, including the report of C.M.B.'s CASA that indicated C.M.B. suffered emotionally and mentally due to being in foster care for over 15 months and having no contact with Mother for nearly six months. The court discussed C.M.B.'s diagnoses of PTSD and generalized anxiety disorder. However, these conditions arose from Mother's inability to provide proper care to C.M.B., progress on her treatment goals, achieve stability, and advance in her visitation sessions with C.M.B. The District Court considered that, prior to the removal of C.M.B. and her siblings, "[d]omestic violence between Mother and her boyfriend in the presence of the children was active and ongoing in the home." The court further considered Mother's criminal behavior, her failure to comply with the treatment plan, and her lack of sobriety throughout the proceedings except for the current period of inpatient treatment. The court found that "Mother has not made significant demonstrable changes that show she can be stable and sober in the community and that would ensure Youth would no longer be subjected to trauma and neglect by Mother."

¶27 We conclude that the District Court's determination that Mother's conduct or condition was not likely to change in a reasonable time was based on substantial and credible evidence found within the record, which the court described as extensive, and that

14

it gave appropriate consideration to all of the concerns required by law, including that the primary concern in making these determinations is the emotional, mental, and physical wellbeing of the child. Section 41-3-609(3), MCA. Further, Montana law provides that termination of parental rights is presumed to be in the best interest of the child if the child has been in the custody of the State or in foster care "for 15 months of the most recent 22 months," which occurred here. Section 41-3-604(1), MCA.

¶28 Affirmed.

/S/ JIM RICE

We Concur:

/S/ CORY J. SWANSON
/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ KATHERINE M. BIDEGARAY

15