DA 10-0142

IN THE SUPREME COURT OF THE STATE OF MONTANA

2011 MT 91

KATHY HEFFERNAN, ROBIN CAREY,
DAVID HARMON, and NORTH DUNCAN
DRIVE NEIGHBORHOOD ASSOCIATION, INC.,

        Plaintiffs and Appellees,

   v.

MISSOULA CITY COUNCIL, CITY OF MISSOULA,
and JOHN ENGEN, Mayor,

        Defendants and Appellants,

   and

MUTH-HILLBERRY, LLC,

        Intervenor-Defendant and Appellant.

APPEAL FROM:   District Court of the Fourth Judicial District,
                 In and For the County of Missoula, Cause No. DV 08-84
                 Honorable Robert L. Deschamps, III, Presiding Judge

COUNSEL OF RECORD:

        For Appellants Missoula City Council, City of Missoula, and John Engen, Mayor:

                James P. Nugent, City Attorney, Susan A. Firth, Missoula City Attorney's
                Office, Missoula, Montana

        For Intervenor-Defendant and Appellant Muth-Hillberry, LLC:

                Donald V. Snavely, Snavely Law Firm, Missoula, Montana

        For Appellees:

                David K. W. Wilson, Jr., Morrison, Motl & Sherwood, PLLP,
                Helena, Montana

For Amicus Curiae Montana Association of Realtors, Inc.:

William K. VanCanagan, J.R. Casillas, Datsopoulos, MacDonald & Lind, P.C., Missoula, Montana

For Amicus Curiae MEIC and Citizens for a Better Flathead:

Sarah K. McMillan, Matthew Bishop, Western Environmental Law Center, Missoula, Montana

Submitted on Briefs:  November 17, 2010

Decided:  May 3, 2011

Filed:

_____
Clerk

2

Justice James C. Nelson delivered the Opinion of the Court.

¶1     In December 2007, the Missoula City Council approved zoning and a preliminary plat for a 37-lot subdivision known as Sonata Park.  Several parties opposed to the subdivision (Neighbors[1]) then filed a petition for judicial review in the Fourth Judicial District Court, Missoula County.  The District Court found that the City was arbitrary and capricious in reaching its zoning and subdivision decisions, and the court accordingly set those decisions aside.  The City and the owner/developer of Sonata Park (Muth-Hillberry, LLC) now appeal that determination and several underlying rulings.  We affirm.

## ISSUES

¶2     The City and Muth-Hillberry raise several issues, which we restate as follows:

1.  Do Neighbors have standing?

2.  Did the District Court err in striking affidavits filed by Muth-Hillberry and the City in connection with their motions for summary judgment?

3.  Does the 1989 agreement between the City and Muth-Hillberry's predecessor in interest supersede the City's growth policy?

4.  Was the City's decision on Sonata Park arbitrary, capricious, or unlawful?

Resolution of these questions moots other issues raised by the parties.

## BACKGROUND

### Rattlesnake Valley

¶3     The proposed Sonata Park subdivision is located on the north side of Missoula in an area of the city known as Rattlesnake Valley.  The following diagram (included in the

---

[1] Kathy Heffernan, Robin Carey, David Harmon, and North Duncan Drive Neighborhood Association, Inc.

record) shows the subdivision's location (labeled "SITE"). The bold line, which has been added to the diagram, represents the western, southern, and eastern boundaries of the Rattlesnake Valley neighborhood growth plan at issue in this case.



¶4 Rattlesnake Valley lies at the southern end of the 82-square-mile Rattlesnake Watershed. Rattlesnake Creek begins near McLeod Peak (17 miles to the north) and

proceeds in a southerly direction, ultimately flowing into the Clark Fork River on the east side of downtown Missoula. The creek has been an important source of water for Missoula residents. A water system was established in Rattlesnake Valley in the 1870s, and an intake dam was built in 1901. Montana Power Company operated the system from 1930 to 1979. In an effort to protect its investment in the water supply, Montana Power purchased most of the private lands above the intake dam in 1934 and 1935, which in turn helped to reduce contamination of potable water by domestic animals. As a result, the upper portion of Rattlesnake Valley was mostly limited to resource management and recreational use, and development occurred primarily in the lower (southern) six square miles of the valley. That area has evolved over the last century from a sparsely settled rural community to a set of interconnected residential neighborhoods.

¶5 Rattlesnake Valley serves as the gateway to the Rattlesnake National Recreation Area and Wilderness, which was established by act of Congress in 1980. The valley also is an important habitat for numerous big game animals, including elk, white-tailed deer, mule deer, black bear, mountain lions, and mountain goats. Two areas in the valley serve as critical winter/spring range for big game, and the remaining open hillsides provide winter feeding areas for deer and elk. In addition, bald eagles, beaver, and blue heron have been sighted frequently in the area around the intake dam.

¶6 The City annexed nearly 1,500 acres of Rattlesnake Valley in 1989, including the land on which Muth-Hillberry proposes to develop Sonata Park. The City adopted interim zoning for the area, but the zoning expired in 1992 and the land became unzoned. Between 1989 and 1992, the City also purchased 418 acres of land in the middle valley

5

for the purpose of preserving the acquired area as open space. This land encompasses hillsides and a creek corridor and is valuable for wildlife habitat and recreational uses such as walking, biking, jogging, horseback riding, and cross-country skiing.

**Growth Policies and Neighborhood Plans**

¶7 At this juncture, it is useful to explain the function of a growth policy. It is the policy of Montana

> to encourage local units of government to improve the present health, safety, convenience, and welfare of their citizens and to plan for the future development of their communities to the end that highway systems be carefully planned; that new community centers grow only with adequate highway, utility, health, educational, and recreational facilities; that the needs of agriculture, industry, and business be recognized in future growth; that residential areas provide healthy surroundings for family life; and that the growth of the community be commensurate with and promotive of the efficient and economical use of public funds.

Section 76-1-102(1), MCA.

¶8 To that end, the governing body of any city, town, or county (or the governing bodies of any combination thereof) is authorized to create a planning board "in order to promote the orderly development of its governmental units and its environs." Section 76-1-101, MCA. Among other things, a planning board is authorized to prepare a growth policy.[2] Section 76-1-106(1), MCA. The required contents of a growth policy are set out in § 76-1-601(3)(a)-(j), MCA. They include maps and text describing the characteristics and features of the jurisdictional area; community goals and objectives; and a description of measures to be implemented in order to achieve those goals and objectives. *See id.* A

---

[2] The terms "master plan," "comprehensive plan," and "comprehensive development plan" were changed to "growth policy" in 1999. *See* Laws of Montana, 1999, ch. 582, § 4; § 76-1-103(4), MCA.

growth policy may also include "neighborhood plans," which must be consistent with the growth policy. Section 76-1-601(4)(a), MCA. A neighborhood plan is "a plan for a geographic area within the boundaries of the jurisdictional area that addresses one or more of the elements of the growth policy in more detail." Section 76-1-103(8), MCA.

¶9 Before submitting a proposed growth policy to the governing body, the planning board must hold a public hearing. Section 76-1-602(1), MCA. After consideration of the information elicited at the public hearing, the board must then recommend that the growth policy be adopted, that a growth policy not be adopted, or that the governing body take some other action. Section 76-1-603, MCA. The governing body, in turn, may adopt or reject a proposed growth policy. Section 76-1-604(1), MCA.

¶10 An adopted growth policy is not a regulatory document. Section 76-1-605(2)(a), MCA. Nevertheless, the governing body still "must be guided by and give consideration to the general policy and pattern of development set out in the growth policy" in the authorization, construction, alteration, or abandonment of public ways, public places, public structures, or public utilities; in the authorization, acceptance, or construction of water mains, sewers, connections, facilities, or utilities; and in the adoption of zoning ordinances or resolutions. Section 76-1-605(1), MCA. A governing body may not withhold, deny, or impose conditions on a land-use approval based solely on compliance with an adopted growth policy. Section 76-1-605(2)(b), MCA.

**Rattlesnake Valley Plan**

¶11 There is a long tradition of coordinated planning endeavors between Missoula County and the City of Missoula, particularly in the Missoula urban area. In 1961, the

7

Missoula City-County Planning Board completed a master plan for the area. In 1975, the City and County collaborated again to create two sets of land-use planning guidelines, one for the Missoula urban area and the other for rural areas. These guidelines were broad in scope and general in application. To address the unique characteristics of individual areas and provide more specific guidance for particular regions, the County and the City adopted various neighborhood plans over the years. These plans were subsequently added as amendments to the general growth policies.

¶12 One such neighborhood plan is the Rattlesnake Valley Comprehensive Plan, which applies to a 12-square-mile area of the Rattlesnake Valley consisting of County land and City land. The area covered by the plan is shown on the map included as an appendix to this Opinion. The proposed Sonata Park subdivision is labeled "SITE" on this map. The County and the City adopted the Rattlesnake Valley plan in 1988 and then adopted an updated version of it in 1995. The County and the City incorporated the 1995 version into the Missoula County Growth Policy in 2002, and reaffirmed it four years later in an update to the Missoula County Growth Policy. The 1995 version of the Rattlesnake Valley plan "thus continue[s] to have full force and effect."

¶13 The Rattlesnake Valley plan was drafted through a public planning process. The 1995 update itself received extensive public review, including five public hearings. Numerous citizens participated in the process. By its terms, the plan is intended "to reduce the problems associated with unplanned and uncoordinated growth." The plan is a "policy document" which provides the City, the County, other agencies and districts, and citizens with "a coordinated guide for change over a long period of time." It addresses a

8

number of questions that had been "the focus of much community discussion for several years," including which areas are best suited for future development, which areas are best suited to remain relatively unchanged, and what role and responsibilities Rattlesnake Valley shares as part of the larger Missoula community. The plan lists various goals and guiding principles under the categories of air and water quality, open space and natural resources, transportation, and neighborhood character and quality of life. The plan then lists the recommended policies and actions with respect to each of these categories.

¶14 On the subject of land use, the plan explains that Rattlesnake Valley ranges from rural to urban. The upper valley is comprised of heavily forested lands and limited residential development, including some small-scale ranches. The middle valley contains some established neighborhoods, with densities ranging from two to six dwelling units per acre. But more than half of this area is sparsely settled or used as pasture land. The lower valley is occupied primarily by residential construction. This area contains the highest densities in the valley (six to eight dwelling units per acre) and is closest to services and existing roadway and pedestrian networks.

¶15 Given these features, the plan does not recommend one development density threshold for the entire valley. Rather, it states that "development should be at a scale which is compatible with the development patterns of existing Rattlesnake neighborhoods and the natural ecosystem which underlies and surrounds the entire study area." To that end, the plan recommends different densities for different parts of the valley. The desired densities range from six to eight dwelling units per one acre (in the very southern portion of the valley) to one dwelling unit per five to ten acres (on the west and east hillsides).

9

Of relevance to the present case, the Sonata Park land—consisting of 34.08 acres on the west hillside—straddles two density zones: one dwelling unit per five to ten acres, and one dwelling unit per two acres. This translates to seven or eight units on the 34.08 acres. The plan states that "[a]ll subdivision, zoning and rezoning requests should substantially comply with the land use recommendations of this Plan."

**Proceedings on the Sonata Park Proposal**

¶16     In 2006, Muth-Hillberry proposed to develop Sonata Park as a 41-lot subdivision. The Missoula Office of Planning and Grants (OPG), however, determined that such development was not consistent with the densities recommended in the Rattlesnake Valley plan. In this regard, OPG observed that the recommended densities

> are a mechanism that can help ensure that goals and objectives for the plan area are met. Development at densities higher than what is recommended in the applicable plan can have a significant negative impact on the natural resources, neighborhood character, and transportation capacity of the plan area as well as the health, safety and welfare of the . . . residents.

OPG also noted that the subdivision was located outside the areas identified in the plan for greater concentration of development and was not compatible with 50 percent or more of the land uses in the immediate vicinity. Surrounding land uses include residential lots (ranging from one to five acres in size) to the east and south, vacant land (also proposed as a subdivision) to the north, and large public open space (Waterworks Hill) to the west. OPG thus denied a zoning compliance permit.

¶17     The following year, Muth-Hillberry submitted a proposal for a 38-lot subdivision. In its application, Muth-Hillberry asserted that under a 1989 agreement between the City and Sunlight Development Company (Muth-Hillberry's predecessor in interest), it was

10

entitled to develop Sonata Park at a higher density than recommended in the Rattlesnake Valley plan. In fact, Muth-Hillberry claimed that "Sonata Park, as proposed for 38 lots, is using only 70% . . . of the single-family density rights allocated to this property under the 1989 Agreement." Since the interim zoning had expired in 1992 and the site was now unzoned, Muth-Hillberry requested that Sonata Park be zoned at two dwelling units per acre, versus the recommended densities of one unit per two acres and one unit per five to ten acres.

¶18 OPG again determined that this request "does not substantially comply with the land use recommendation in the Comprehensive Plan/Growth Policy regarding residential density." Nevertheless, OPG staff recommended approval. At the December 4, 2007 meeting of the Missoula Consolidated Planning Board, the OPG case planner explained that she had balanced many factors in making her recommendation, but one that she had considered especially "important" was the fact that a density of four units per acre is, according to the city engineer, the minimum needed to recoup the cost of providing sewer service to a given area. She acknowledged, though, that "not every area within the city's wastewater treatment facilities area is appropriate at four per acre or greater."

¶19 Proponents and opponents of Sonata Park attended the Planning Board meeting. Representatives of Muth-Hillberry spoke in favor of the project, while Neighbors and other members of the public spoke against it. Their objections included the alleged failure of the proposed subdivision and zoning to comply with the Rattlesnake Valley plan, the alleged instability of the land and soils, and the high density of the development relative to neighboring developments. One of the Neighbors clarified that they were not

opposed to any and all development, but only to development that did not substantially comply with the growth policy. He argued that the law required such compliance and that this project "is not even close." Another resident said that she had read the growth policy before buying her land on the west side of the valley and "everything in it led me to believe that future development would be mindful of the unique rural character of the neighborhood." She noted that development in the area thus far had been consistent with the Rattlesnake Valley plan. Nevertheless, the Planning Board voted to recommend approval of Muth-Hillberry's application. During the debate, one of the board members indicated that he did not "put a lot of weight" on the growth policy argument. In his view, the process of creating a growth policy "wastes people's time. It makes them think they are being involved [but] when it comes right down to it they're really not." Two other board members expressed the view that Rattlesnake Valley needed to do its part in providing new homes for Missoula. Another opined that the "original framers" of the Rattlesnake Valley plan "had this land envisioned to be developed more densely."

¶20 The City Council's Plat, Annexation, and Zoning (PAZ) Committee considered Sonata Park at its December 5 meeting. Members of the public, including Neighbors, appeared and expressed their concerns relating to bicycle and pedestrian safety, fire risks, soil stability, doubling the size of the neighborhood if the subdivision were approved, and lack of substantial compliance with the growth policy. Neighbors reiterated these points at a meeting of the City Council on December 10.

¶21 The issue was then sent back to the PAZ Committee, which held another meeting on December 12. Neighbors again appeared and voiced their concerns and objections.

12

The committee reconvened on December 14, at which time a motion was made to zone the property at the requested two dwelling units per acre. One of the committee members who opposed this motion observed that in the recent use of neighborhood plans, the call for lower densities was being ignored. He stated that when the applicable growth policy is disregarded, it sends a message to the public that the City does not value their input. In contrast, another committee member argued that Sonata Park fit the development pattern of the area. Still another committee member argued that every part of the city should share in its growth. Ultimately, a majority voted in favor of the motion.

¶22 Finally, on December 17, the City Council voted on the zoning and subdivision. Again, members of the public, including Neighbors, commented extensively. Among other things, they stated that it had been "discouraging to hear city employees and officials and advisors downplay the value of our Rattlesnake Comprehensive Plan as the Sonata Park Subdivision proposal has been discussed." Similarly, one of the council members voiced opposition to the project because "it doesn't honor the 1995 Rattlesnake Valley Plan." She stated that she would be open to a compromise of 17 to 20 dwelling units, but a density of more than three times the recommended density is "too much." Similarly, another council member expressed concern that they were "turning a blind eye" to the extensive work that had gone into the Rattlesnake Valley plan. In addition, he countered the notion that Rattlesnake Valley residents saw themselves as exclusive or exempt from the pressures of growth. He argued that the hills north of Missoula were ecologically unique and that it was important to preserve the "ecological integrity" of the area. Conversely, other council members argued that a property owner should have

"considerable say" in how his property is developed. They also noted that the Rattlesnake area had been zoned at two dwelling units per acre prior to annexation by the City in 1989. As before, the need for more housing due to the City's ongoing growth was cited as further reason to approve the subdivision. The City Council then voted (10 to 2) to grant the zoning request and to approve the subdivision with 37 lots. The next day, the City sent a letter to Muth-Hillberry apprising the developer that Sonata Park had been approved, subject to 34 listed conditions.

### District Court Proceedings

¶23 On January 16, 2008, Neighbors sought review of the City's decisions by the District Court. They alleged that the City had violated subdivision and zoning laws; that the City's approval of Sonata Park was arbitrary, capricious, and unlawful because the subdivision is not in substantial compliance with the Rattlesnake Valley plan; and that the City had violated their right to participate under Article II, Section 8 of the Montana Constitution. They requested that the court void the City's decisions and enjoin the City from granting final plat approval of the subdivision.

¶24 Muth-Hillberry intervened as a party-defendant. The City then filed a motion to dismiss on the ground that Neighbors did not have standing under § 76-3-625, MCA, to appeal a subdivision decision. The District Court concluded, however, that Neighbors met the requirements of the statute. The parties then filed cross-motions for summary judgment based on their various interpretations of the record, but the District Court denied those motions on the ground that there were "disputed material factual issues regarding whether the City was, in the very least, 'guided by' the Growth Plan, much less

14

whether it 'substantially complied' with it when it approved 37 lots for development." The parties thereafter reached an agreement regarding the record and filed a stipulation as to the contents of " 'the record' of the proceedings from which this appeal was taken." In the meantime, the City and Muth-Hillberry filed six affidavits in connection with their motions for summary judgment. However, pursuant to Neighbors' motions to strike, the District Court struck most of these affidavits as irrelevant or because they contained information outside the record on which the City Council's decision had been based.

¶25 Although the City Council had not issued written findings of fact with its Sonata Park decision, *see* § 76-3-608(2), MCA, the City argued to the District Court that the proposed findings in OPG's Executive Summary were sufficient. The court disagreed, noting that this summary had been prepared *before* the public hearings and had not been formally adopted by the City Council. The court thus ordered the City to provide written findings of fact with corresponding citations to the stipulated record. The City eventually did so, though the District Court later expressed dissatisfaction with the City's "minimal"—and in some instances inaccurate—citations to the record.

¶26 On February 24, 2010, the District Court entered an opinion and order granting summary judgment to Neighbors. The court determined that "the City's approval of the Sonata Park subdivision is a significant deviation from the Rattlesnake Plan and therefore arbitrary and capricious." First, the court observed that the City had "essentially ignored the central component of the Rattlesnake Plan, the land use recommendations, when it approved a subdivision with over four-times the recommended density." The court then detailed, over the course of 18 pages, how the City had "ignored or failed to substantiate

15

its findings on a number of other components of the Plan as well." Having concluded that the City "failed to substantially comply with the density recommendations, and with many other recommendations, of the Rattlesnake Plan," the court set the zoning and subdivision decisions aside and entered judgment in favor of Neighbors.

## DISCUSSION

¶27 *Issue 1. Do Neighbors have standing?*

¶28 The determination of a party's standing to maintain an action is a question of law, as is the interpretation of a statute. We review such questions de novo. *Druffel v. Bd. of Adjustment*, 2007 MT 220, ¶ 9, 339 Mont. 57, 168 P.3d 640; *State v. Weaver*, 2008 MT 86, ¶ 10, 342 Mont. 196, 179 P.3d 534.

¶29 Standing is one of several justiciability doctrines which limit Montana courts, like federal courts, to deciding only "cases" and "controversies." *See Plan Helena, Inc. v. Helena Regl. Airport Auth. Bd.*, 2010 MT 26, ¶¶ 6-8, 355 Mont. 142, 226 P.3d 567. A court lacks power to resolve a case brought by a party without standing—i.e., a personal stake in the outcome—because such a party presents no actual case or controversy. *Ballas v. Missoula City Bd. of Adjustment*, 2007 MT 299, ¶¶ 14-16, 340 Mont. 56, 172 P.3d 1232. Hence, standing is a threshold, jurisdictional requirement in every case. *Bryan v. Yellowstone County Elementary Sch. Dist. No. 2*, 2002 MT 264, ¶ 19, 312 Mont. 257, 60 P.3d 381. The parties cannot waive objections to standing, and a court may address the standing requirement sua sponte. *Jones v. Montana U. Sys.*, 2007 MT 82, ¶ 48, 337 Mont. 1, 155 P.3d 1247. In the present case, the City has expressly challenged Neighbors' standing.

16

**Background Principles**

¶30 The question of standing is whether the litigant is entitled to have the court decide the merits of the dispute. *Helena Parents Commn. v. Lewis and Clark County Commrs.*, 277 Mont. 367, 371, 922 P.2d 1140, 1142 (1996). Standing is determined as of the time the action is brought. *Becker v. Fed. Election Commn.*, 230 F.3d 381, 386 n. 3 (1st Cir. 2000); *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1154-55 (10th Cir. 2005).[3] In this regard, standing must not be confused with mootness. Standing requires the plaintiff to have a personal stake in the outcome of the controversy at the commencement of the litigation, whereas mootness doctrine requires this personal stake to continue throughout the litigation. *Greater Missoula Area Fedn. of Early Childhood Educators v. Child Start, Inc.*, 2009 MT 362, ¶ 23, 353 Mont. 201, 219 P.3d 881; *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189, 120 S. Ct. 693, 708-09 (2000).

¶31 Although we have not always made the distinction explicit, there are in fact two strands to standing: the case-or-controversy requirement imposed by the Constitution, and judicially self-imposed prudential limitations.[4] *Olson v. Dept. of Revenue*, 223 Mont. 464, 469-70, 726 P.2d 1162, 1166 (1986); *Elk Grove Unified Sch. Dist. v. Newdow*, 542

_____

[3] Because the "cases at law and in equity" language of Article VII, Section 4(1) of the Montana Constitution embodies the same limitations as are imposed by the "case or controversy" language of Article III, Section 2 of the United States Constitution, we have said that federal precedents interpreting Article III, Section 2 are persuasive authority for interpreting the justiciability requirements of Article VII, Section 4(1). *Plan Helena*, ¶ 6.

[4] The Supreme Court likewise "has not always been clear . . . whether particular features of the 'standing' requirement have been required by Art. III *ex proprio vigore*, or whether they are requirements that the Court itself has erected and which were not compelled by the language of the Constitution." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471, 102 S. Ct. 752, 758 (1982).

U.S. 1, 11-12, 124 S. Ct. 2301, 2308 (2004). For reasons explained below, it is important to distinguish between these two strands.

¶32    In federal jurisprudence, "the irreducible constitutional minimum of standing" has three elements: injury in fact (a concrete harm that is actual or imminent, not conjectural or hypothetical), causation (a fairly traceable connection between the injury and the conduct complained of), and redressability (a likelihood that the requested relief will redress the alleged injury). *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 2136 (1992); *Steel Co. v. Citizens for a Better Env.*, 523 U.S. 83, 103, 118 S. Ct. 1003, 1016-17 (1998). Beyond these minimum constitutional requirements, the Supreme Court has adopted several prudential limits: the plaintiff generally must assert her own legal rights and interests; the courts will not adjudicate generalized grievances more appropriately addressed in the representative branches; and the plaintiff's complaint must fall within the zone of interests protected by the law invoked. *Newdow*, 542 U.S. at 12, 124 S. Ct. at 2309. These rules are "closely related to Art. III concerns but essentially matters of judicial self-governance." *Warth v. Seldin*, 422 U.S. 490, 499-500, 95 S. Ct. 2197, 2205 (1975). Hence, they are subject to exceptions. *See e.g. Powers v. Ohio*, 499 U.S. 400, 410, 111 S. Ct. 1364, 1370 (1991) (the requirement that a litigant assert her own legal rights and interests "admits of certain, limited exceptions").

¶33    Similarly, in Montana, to meet the constitutional case-or-controversy requirement, the plaintiff must clearly allege a past, present, or threatened injury to a property or civil right. *Olson*, 223 Mont. at 470, 726 P.2d at 1166; *Bd. of Trustees v. Cut Bank Pioneer Press*, 2007 MT 115, ¶ 15, 337 Mont. 229, 160 P.3d 482. Furthermore, the injury must

be one that would be alleviated by successfully maintaining the action. *Jones*, ¶ 48; *In re Vainio*, 284 Mont. 229, 235, 943 P.2d 1282, 1286 (1997). As for prudential requirements, we have observed that discretionary limits on the exercise of judicial power "cannot be defined by hard and fast rules." *Missoula City-County Air Pollution Control Bd. v. Bd. of Envtl. Rev.*, 282 Mont. 255, 260, 937 P.2d 463, 466 (1997). Nevertheless, we have recognized the prudential rule that a litigant may only assert her own constitutional rights or immunities. *Jones*, ¶ 48; *In re B.F.*, 2004 MT 61, ¶ 16, 320 Mont. 261, 87 P.3d 427. We have also required the alleged injury to be distinguishable from the injury to the public generally, though not necessarily exclusive to the plaintiff. *Cut Bank Pioneer Press*, ¶ 15. Conversely, a countervailing factor weighing against these prudential restrictions is "the importance of the question to the public." *Air Pollution Control Bd.*, 282 Mont. at 260, 937 P.2d at 466. Another is whether the statute at issue would effectively be immunized from review if the plaintiff were denied standing. *See e.g. Gryczan v. State*, 283 Mont. 433, 446, 942 P.2d 112, 120 (1997).

¶34 Importantly, the legislative branch "may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n. 3, 93 S. Ct. 1146, 1148 n. 3 (1973); *see also Defenders of Wildlife*, 504 U.S. at 578, 112 S. Ct. at 2145-46. Similarly, the legislative branch may expand standing by expressly modifying or abrogating prudential standing rules. *Bennett v. Spear*, 520 U.S. 154, 162, 117 S. Ct. 1154, 1161 (1997) ("[U]nlike their constitutional counterparts, [prudential requirements] can be modified or abrogated by Congress."); *Gladstone Realtors v. Village of Bellwood*, 441

U.S. 91, 100, 99 S. Ct. 1601, 1608 (1979) ("Congress may, by legislation, expand standing to the full extent permitted by Art. III, thus permitting litigation by one who otherwise would be barred by prudential standing rules." (internal quotation marks omitted)); *Warth*, 422 U.S. at 501, 95 S. Ct. at 2206 ("Congress may grant an express right of action to persons who otherwise would be barred by prudential standing rules."); *In re Conservatorship of Kloss*, 2005 MT 39, ¶ 10, 326 Mont. 117, 109 P.3d 205 (concluding that the Legislature had broadly defined those who have standing to petition a court on behalf of a protected person). When the legislative branch augments standing, it may simultaneously limit it to certain parties. *See e.g. Bread PAC v. Fed. Election Commn.*, 455 U.S. 577, 102 S. Ct. 1235 (1982). But in all events, the standing requirements imposed by the Constitution must always be met. *Vainio*, 284 Mont. at 235, 943 P.2d at 1286 ("The mere fact that a person is entitled to bring an action under a given statute is insufficient to establish standing; the party must allege some past, present or threatened injury which would be alleviated by successfully maintaining the action."); *Gollust v. Mendell*, 501 U.S. 115, 126, 111 S. Ct. 2173, 2180 (1991).

**Neighbors' Standing**

¶35    As noted, a plaintiff must clearly allege a past, present, or threatened injury to *a property or civil right*—i.e., an invasion of *a legally protected interest*. Thus, standing often turns on the source of the plaintiff's claim, since the actual or threatened injury required by the Constitution might exist solely by virtue of statutes creating legal rights. *Warth*, 422 U.S. at 500, 95 S. Ct. at 2206. Such is the case here. Under *Sourdough Protective Assn., Inc. v. Bd. of County Commrs.*, 253 Mont. 325, 833 P.2d 207 (1992),

20

and *City of Kalispell v. Flathead County*, 260 Mont. 258, 859 P.2d 458 (1993), there is no right to appeal a governing board's approval of a preliminary subdivision plat, except as provided by statute. Responding to these two decisions, the Legislature created the appeal mechanism set forth in § 76-3-625, MCA, which Neighbors invoked in bringing the present action. *See* Laws of Montana, 1995, ch. 468, § 10. Where the Legislature " 'has authorized public officials to perform certain functions according to law, and has provided by statute for judicial review of those actions under certain circumstances, the inquiry as to standing must begin with a determination of whether the statute in question authorizes review at the behest of the plaintiff.' " *Druffel*, ¶ 15 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 732, 92 S. Ct. 1361, 1364-65 (1972)).

¶36 Section 76-3-625(2), MCA, provides that certain parties who are "aggrieved" by a decision of the governing body to approve, conditionally approve, or deny an application and preliminary plat for a proposed subdivision or a final subdivision plat may appeal to the district court in the county in which the property involved is located. The parties who may appeal under this provision are the subdivider, the county commissioners, certain municipalities, and "a landowner with a property boundary contiguous to the proposed subdivision or a private landowner with property within the county or municipality where the subdivision is proposed if that landowner can show a likelihood of material injury to the landowner's property or its value." Section 76-3-625(3), MCA. The statute defines "aggrieved" as "a person who can demonstrate a specific personal and legal interest, as distinguished from a general interest, who has been or is likely to be specially and injuriously affected by the decision." Section 76-3-625(4), MCA.

21

¶37   In its motion to dismiss, the City argued that Neighbors had not met these requirements—specifically, that none of them had alleged or shown a material injury to their property or its value, a specific personal and legal interest, and a special and injurious effect flowing from the subdivision approval.   The District Court concluded otherwise, reasoning that the adverse impacts cited by Neighbors (such as increased traffic, noise, and pollution, and disruption of wildlife in the area) could materially injure their properties or the value of their properties.   The court observed that it was not necessary "for the Plaintiffs to allege specific physical property damage or dollar amounts for injuries to property values in order to bring a suit under § 76-3-625, MCA." On appeal, the City correctly acknowledges that adverse impacts do not have to be monetary.   Rather, the City contends that Neighbors' alleged injuries "could apply to any new residence" and "are ambiguous and too general" to meet the standard set out in § 76-3-625, MCA.   We disagree.

¶38   One of the purposes of the Montana Subdivision and Platting Act is to "promote the public health, safety, and general welfare by regulating the subdivision of land." Section 76-3-102(1), MCA.   "Legislation enacted for the promotion of public health, safety, and general welfare, is entitled to liberal construction with a view towards the accomplishment of its highly beneficent objectives." *State ex rel. Florence-Carlton Sch. Dist. No. 15-16 v. Bd. of County Commrs.*, 180 Mont. 285, 291, 590 P.2d 602, 605 (1978) (internal quotation marks omitted).   With this principle in mind, we first consider Heffernan's affidavit filed in response to the City's motion to dismiss.   It states that the western boundary of her property shares the northeastern boundary of Sonata Park.   In

22

other words, she is "a landowner with a property boundary contiguous to the proposed subdivision" and, as such, satisfies § 76-3-625(3)(b), MCA.[5] As to whether she is "aggrieved," Heffernan states that she and her family have resided on the west side of Rattlesnake Valley for 18 years. She explains that their neighborhood reflects a transition from city to wilderness, and she identifies numerous animals that frequent her property and the surrounding area. She says the presence of this wildlife is "an important value to us" and "one of the reasons that we chose to live here." She also discusses the value of the neighborhood's low density and states that "dense development adjacent to our property will diminish this [rural] quality for my family and myself, and diminish the value of our property in the future." She notes that the impact of 37 new homes— including 259 to 370 additional vehicle trips per day (as estimated by the developer), increased noise, more pets, and less wildlife—will "significantly alter" the neighborhood for the worse. She states that when she moved to her property, she "believed that the recommendations of the Rattlesnake Comprehensive Plan would be considered for any future development." She and her husband expressed their concerns about Sonata Park in letters to the Planning Board and the City Council and at the various public meetings on

---

[5] The City asserts that Heffernan must also show a likelihood of material injury to her property or its value. *See* § 76-3-625(3)(b), MCA (authorizing an appeal by "a landowner with a property boundary contiguous to the proposed subdivision or a private landowner with property within the county or municipality where the subdivision is proposed *if that landowner can show a likelihood of material injury to the landowner's property or its value*" (emphasis added)). We agree with Neighbors, however, that the language requiring "that landowner" to show a likelihood of material injury refers to a private landowner with property elsewhere in the county or municipality. The owner of property contiguous to the subdivision has standing without this additional showing, so long as the contiguous landowner is "aggrieved" under subsection (4) of the statute.

23

the subdivision. We hold that these averments are sufficient to establish that Heffernan has a specific personal and legal interest and is likely to be specially and injuriously affected by the subdivision. Section 76-3-625(4), MCA; *cf. Aspen Trails Ranch, LLC v. Simmons*, 2010 MT 79, ¶¶ 41-43, 356 Mont. 41, 230 P.3d 808 (contiguous landowner's allegations that the subdivision would affect the enjoyment of his property, adversely impact the quality of his water supply, impact wildlife habitat and wetlands, increase noise, traffic, and light pollution, and decrease the value of his property were sufficient to establish standing); *Little v. Bd. of County Commrs.*, 193 Mont. 334, 355, 631 P.2d 1282, 1294 (1981) ("the increased traffic alone was sufficient to show that plaintiffs, as adjacent owners, would be injured in a manner that the general public would not").

¶39 Carey and Harmon also filed affidavits on the issue of standing. Carey's property, which he bought in 2001, is located within 150 feet of Sonata Park. It is adjacent to the sole access road to the subdivision and, as a result, will be directly affected by the increased traffic. In fact, Carey avers that "the combined noise, dust, and steady intrusion very close to our living space (about 100 feet from living and dining room view windows) will negatively affect our ability to enjoy the natural rural values of our home." Carey states that before he bought his property, he "read the Rattlesnake Comprehensive Plan and believed that its goals and guidelines would be the dominant roadmap of development in our neighborhood." He explains that the viewshed, the rural character of the area, and the wildlife—all of which the Rattlesnake Valley plan endorses—are valuable to him and his family. He alleges that Sonata Park will destroy or degrade these aspects of the neighborhood which, in turn, will erode the value of his property. Carey

24

also alleges that the development poses a danger of injury to his family and damage to his property due to soil issues and the potential for a landslide. He notes that he expressed his concerns to city officials but received "no meaningful response."

¶40 Harmon's property, which he bought in 1991, is within 600 feet of Sonata Park. It too lies along the access road and, thus, will be directly affected by the increased traffic. Harmon cites most of the same adverse impacts alleged by Heffernan and Carey (traffic, noise, detrimental effects on wildlife). In addition, he asserts that allowing Sonata Park's density of development will create "light pollution" and greatly increase the danger to pedestrians and bicyclists using the neighborhood streets, which do not have sidewalks, curbs, or designated bike lanes. He alleges that the effects of the subdivision will result in a decrease in his property's value. We hold that these allegations by Harmon and Carey are sufficient to establish a likelihood of material injury to each one's property or its value, a specific personal and legal interest, and a likelihood of being specially and injuriously affected by the subdivision. Section 76-3-625(3)(b), (4), MCA.

¶41 Heffernan, Carey, and Harmon therefore have statutory standing. However, as noted, "[t]he mere fact that a person is entitled to bring an action under a given statute is insufficient to establish standing; the party must allege some past, present or threatened injury which would be alleviated by successfully maintaining the action." *Vainio*, 284 Mont. at 235, 943 P.2d at 1286; *see also e.g. Bennett*, 520 U.S. 154, 117 S. Ct. 1154 (addressing constitutional standing after determining that standing existed under the statute). Yet, unlike the statute involved in *Vainio*, which allowed "any interested party" to bring a paternity action, the statute involved in the present case requires the plaintiff to

25

demonstrate "a specific personal and legal interest" and that she "has been or is likely to be specially and injuriously affected by the decision [of the governing body]." Section 76-3-625(4), MCA. Satisfaction of these criteria, we conclude, is sufficient to establish the existence of a case or controversy. Accordingly, we hold that Heffernan, Carey, and Harmon have constitutional standing as well.

¶42 As a final matter, the City contends that "North Duncan Drive Neighborhood Association is not pled as a landowner" and "is therefore *not* eligible" to appeal under § 76-3-625, MCA. If the Association were claiming injuries to *itself*, we would agree. But that is not the case. An organization may have standing in either of two ways: it may file suit on its own behalf to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy, or it may assert the rights of its members under the doctrine of associational standing. *Irish Lesbian and Gay Org. v. Giuliani*, 143 F.3d 638, 649 (2d Cir. 1998). In the latter situation, the association and its members are "in every practical sense identical." *United Food and Com. Workers v. Brown Group, Inc.*, 517 U.S. 544, 552, 116 S. Ct. 1529, 1534 (1996) (internal quotation marks omitted). Here, the Association does not seek judicial relief from an injury to itself; rather, it seeks to represent the legal interests of its members.

¶43 It is well established that an association has standing to bring suit on behalf of its members, even without a showing of injury to the association itself, when (a) at least one of its members would have standing to sue in his or her own right, (b) the interests the association seeks to protect are germane to its purpose, and (c) neither the claim asserted nor the relief requested requires the individual participation of each allegedly injured

26

party in the lawsuit. *Warth*, 422 U.S. at 511, 95 S. Ct. at 2211-12; *Hunt v. Washington State Apple Advertising Commn.*, 432 U.S. 333, 343, 97 S. Ct. 2434, 2441 (1977). The first two prongs of this test are grounded in the constitutional requirement of a case or controversy, while the third prong focuses on "matters of administrative convenience and efficiency, not on elements of a case or controversy," and thus is prudential. *United Food*, 517 U.S. at 554-57, 116 S. Ct. at 1535-36.

¶44 Associational standing is an exception to the general prohibition on a litigant's raising a third party's legal rights. *Id.* at 557, 116 S. Ct. at 1536; *Retired Chicago Police Assn. v. City of Chicago*, 76 F.3d 856, 862 (7th Cir. 1996). The doctrine of associational standing "recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others." *United Automobile Workers v. Brock*, 477 U.S. 274, 290, 106 S. Ct. 2523, 2533 (1986).

> [A]n association suing to vindicate the interests of its members can draw upon a pre-existing reservoir of expertise and capital. Besides financial resources, organizations often have specialized expertise and research resources relating to the subject matter of the lawsuit that individual plaintiffs lack. These resources can assist both courts and plaintiffs.

*Id.* at 289, 106 S. Ct. at 2532 (citation and internal quotation marks omitted).

¶45 Consistent with these principles, this Court has recognized standing on the part of organizations that were proceeding on behalf of their members, based on considerations substantially equivalent to those articulated in *Hunt*. *See e.g. Geil v. Missoula Irrigation Dist.*, 2002 MT 269, ¶¶ 28-32, 312 Mont. 320, 59 P.3d 398 (finding standing where the organization had demonstrated potential economic injury to its members resulting from enforcement of the statutes, the organization was the only entity authorized by the

statutes to object to their enforcement, the alleged injury to the organization's members was not shared by the public generally, and denying standing would effectively immunize the statutes from review); *Montana Envtl. Info. Ctr. v. Dept. of Envtl. Quality*, 1999 MT 248, ¶¶ 4, 41-45, 296 Mont. 207, 988 P.2d 1236 (finding standing based on the injuries allegedly suffered by the organizations' members).

¶46　In the present case, therefore, the Association has standing to proceed on behalf of its members if (a) at least one of its members would have standing to sue in his or her own right, (b) the interests the Association seeks to protect are germane to its purpose, and (c) neither the claim asserted nor the relief requested requires the individual participation of each allegedly injured party in the lawsuit.　First, Heffernan, Carey, and Harmon are members of the Association, and, as explained above, they have standing to sue in their own right.　Second, the Association's purpose (according to Harmon's and Carey's affidavits) is "to deal with land use issues and densities in our mostly unzoned neighborhood" and "to advocate for the Rattlesnake Valley Growth Plan and its underlying principles."　The interests the Association seeks to protect in the instant suit (its members' claims that Sonata Park is contrary to the Rattlesnake Valley plan) are germane to this purpose. *See Bldg. and Constr. Trades Council v. Downtown Dev., Inc.*, 448 F.3d 138, 149 (2d Cir. 2006).　And nothing in the record suggests a "profound" conflict of interest among the Association and its members. *See Retired Chicago Police*, 76 F.3d at 864-65, 867.　Third, Neighbors alleged that the City's approval of Sonata Park was arbitrary, capricious, and unlawful, and they requested declaratory and injunctive relief.　Adjudication of this claim does not require participation by each allegedly injured

28

member of the Association. *See Hosp. Council v. City of Pittsburgh*, 949 F.2d 83, 89-90 (3d Cir. 1991). Likewise, a request for declaratory and injunctive relief does not require participation by individual association members. *Id.* at 89; *cf. United Union of Roofers v. Ins. Corp. of America*, 919 F.2d 1398, 1400 (9th Cir. 1990) (claims for monetary relief necessarily involve individualized proof and thus the individual participation of association members). And there is no risk that the relief requested would fail to inure to the benefit of the members on whose behalf injury is claimed. *See United Food*, 517 U.S. at 556, 116 S. Ct. at 1536; *Warth*, 422 U.S. at 515, 95 S. Ct. at 2213. Accordingly, the Association has standing to assert the rights of its members.

¶47 In sum, we hold that Heffernan, Carey, and Harmon have demonstrated statutory and constitutional standing and that the Association has associational standing to proceed on behalf of its members. We reject the City's arguments to the contrary.

¶48 ***Issue 2. Did the District Court err in striking affidavits filed by Muth-Hillberry and the City in connection with their motions for summary judgment?***

¶49 The City and Muth-Hillberry filed six affidavits in connection with their summary judgment motions. Neighbors then filed two motions to strike these affidavits, which the District Court granted in part and denied in part. The City and Muth-Hillberry now challenge the District Court's rulings. We begin with the City's arguments.

¶50 The City filed the affidavits of John Engen (Missoula City Mayor), Jack Reidy (member of the City Council from 1986 through 2007), and Denise Alexander (OPG Principal Planner). These affidavits contain explanations of the City Council's "common practice" for reviewing and voting on subdivision applications. The evident purpose of

29

the affidavits was to explain why the City believed it had satisfied § 76-3-608(2), MCA, which requires a governing body to issue written findings of fact in conjunction with its decision to approve, conditionally approve, or deny a proposed subdivision. The District Court concluded, however, that this information was irrelevant and had no bearing on the issue before the court. Accordingly, the court struck the affidavits. On appeal, the City offers the blanket assertion that the District Court erred in granting Neighbors' motion to strike. Yet, the City provides no explanation as to why the court's ruling vis-à-vis the Engen, Reidy, and Alexander affidavits was incorrect.

¶51 The City also filed the affidavits of Martha Rehbein (Missoula City Clerk) and Mary McCrea (OPG Senior Planner). Rehbein's affidavit and the first part of McCrea's affidavit concern the Rattlesnake Valley Planned District Overlay Zone. Both Rehbein and McCrea state what appears to be an undisputed fact: that the City Council has never applied the Rattlesnake Overlay to the land included in the Sonata Park subdivision. The District Court found this fact to be potentially relevant to its decision on the parties' motions for summary judgment. Thus, the court *denied* the motion to strike Rehbein's affidavit and *denied* the motion to strike the first part of McCrea's affidavit. The remainder of McCrea's affidavit, however, summarizes the City Council's process in addressing the issues raised by Neighbors concerning Sonata Park. The District Court struck this part of the affidavit, aptly stating that it would "rely on the stipulated record directly rather than on Defendants' summaries."

¶52 On appeal, the City argues that it was "entitled to prove by affidavit pursuant to [M. R. Civ. P. 56] the Rattlesnake Overlay was never implemented by the City Council."

The City contends that Rehbein's and McCrea's affidavits were necessary for this purpose and that the District Court "erred in striking the affidavits and in allowing [Neighbors] to continue an erroneous zoning district argument." Yet, as Neighbors point out, they acknowledged during the District Court proceedings that the overlay had never been implemented. Furthermore, as noted, the District Court DENIED the motions to strike Rehbein's affidavit and the first part of McCrea's affidavit, both of which state that the Rattlesnake Overlay has never been applied to Sonata Park land. It is thus a mystery why the City has raised this as an issue on appeal. Accordingly, the District Court's rulings as to the five affidavits filed by the City are affirmed.

¶53    Muth-Hillberry filed the affidavit of Frank Muth, who is the managing member of Muth-Hillberry. Muth's affidavit deals exclusively with the "Sunlight Agreement," the above-mentioned 1989 agreement between the City and Sunlight Development Company (Muth-Hillberry's predecessor in interest). Relying on *Skyline Sportsmen's Assn. v. Bd. of Land Commrs.*, 286 Mont. 108, 113, 951 P.2d 29, 32 (1997), and *Asarco, Inc. v. U.S. EPA*, 616 F.2d 1153, 1159-60 (9th Cir. 1980), the District Court struck the affidavit on the ground that it contained extra-record evidence which the court was not allowed to consider in deciding the issue raised by Neighbors—namely, whether the approval of Sonata Park was arbitrary, capricious, or unlawful in light of the administrative record the City had at the time of its decision. The court noted that Neighbors had not challenged the Sunlight Agreement or sought any relief related to the agreement.

¶54    On appeal, Muth-Hillberry points out that the Muth affidavit was not offered for purposes of determining whether the City's action was arbitrary, capricious, or unlawful.

31

In addition to answering Neighbors' First Amended Complaint, Muth-Hillberry counterclaimed for declaratory relief. It asked the court to adjudicate and declare all rights and obligations of the parties with respect to this controversy and the subdivision. More specifically, in its motion for summary judgment, Muth-Hillberry asked the court to determine, as a matter of law, that the Sunlight Agreement overrides the density recommendations in the Rattlesnake Valley plan insofar as they apply to Sonata Park. The Muth affidavit was filed in support of this claim. Muth-Hillberry observes that a ruling in its favor on this issue—i.e., that the Sunlight Agreement "superseded and rendered irrelevant the 1995 Growth Policy"—would have mooted Neighbors' claim that the City's action was arbitrary, capricious, or unlawful. Thus, Muth-Hillberry argues that "[i]n striking the Muth Affidavit, the District Court erred by preventing [Muth-Hillberry] from submitting admissible evidence to support its motion under [M. R. Civ. P. 56]."

¶55 This Court reviews evidentiary rulings going directly towards the propriety of summary judgment de novo, in order to determine whether the evidentiary requirements for summary judgment have been satisfied. *PPL Mont., LLC v. State*, 2010 MT 64, ¶ 85, 355 Mont. 402, 229 P.3d 421. Doing so here, we agree with Muth-Hillberry that the District Court's rationale for striking Muth's affidavit was misplaced. A party is entitled to support its motion for summary judgment with an affidavit, M. R. Civ. P. 56(a), (b), so long as the affidavit is made on personal knowledge, sets forth such facts as would be admissible in evidence, and shows affirmatively that the affiant is competent to testify to the matters stated therein, M. R. Civ. P. 56(e). Muth-Hillberry filed the Muth affidavit in support of its legal theory that the Sunlight Agreement supersedes the Rattlesnake Valley

32

plan. This theory (which Muth-Hillberry asserted in its subdivision application and has maintained ever since) is related to, but distinct from, the question whether the City Council's decision was arbitrary, capricious, or unlawful. Accordingly, to the extent the Muth affidavit otherwise satisfies Rule 56(e), it should not have been stricken. Nevertheless, because the Sunlight Agreement does not supersede the Rattlesnake Valley plan (*see* Issue 3, *infra*), the error was harmless. M. R. Civ. P. 61.

¶56 ***Issue 3. Does the Sunlight Agreement supersede the City's growth policy?***

¶57 The construction and interpretation of a contract is a question of law for the court to decide, and one that we review for correctness. *Kruer v. Three Creeks Ranch of Wyoming, LLC*, 2008 MT 315, ¶ 37, 346 Mont. 66, 194 P.3d 634.

¶58 Muth-Hillberry acquired the property on which Sonata Park is situated in 1992. This property had been part of a larger, 939-acre parcel owned by Sunlight Development Company. In March 1989, the City and Sunlight entered into the Sunlight Agreement, pursuant to which the City agreed to furnish sanitary sewage services to Sunlight's land under § 7-13-4312, MCA. Sunlight contributed $335,000 to the project through a rural special improvement district (RSID), and its property was allocated 2,625 sewer loading units. At the time, the 1975 Urban Area Comprehensive Plan allowed for a base density of 2,500 dwelling units on Sunlight's property, and the 1976 county zoning allowed for a base density of 1,900 dwelling units on the property. These densities are noted in the Sunlight Agreement.

¶59 Of relevance to the present case, the Sunlight Agreement gives the City "the option to acquire public parklands, restrictive easements, covenants, reservations, sewer

density units, land development rights, and other rights as specifically designated in the Option To Purchase attached hereto." The Option To Purchase, in turn, lists the following which the City has the option to purchase from Sunlight:

- fee title to 85.7 acres for use as parklands, natural areas, and riparian zone;

- fee title or conservation easement rights in 260.7 acres for use as open space;

- Sunlight's "right, title and interest in and to all density units in excess of 1,432 on its lands in the Rattlesnake Valley"; and

- "transfer of all assessment sewer rights from and under [the RSID] presently existing on the property in excess of 1,432 units."

Furthermore, the City is given the additional option to purchase:

- Sunlight's "right, title and interest in and to an additional 432 density units so as to limit the same to 1,000 on its lands in the Rattlesnake Valley"; and

- "transfer of an additional 432 units of assessment sewer rights from and under [the RSID]."

¶60 According to Muth's affidavit, the City exercised its option in 1991 and acquired the 346.4 acres, which it dedicated to public parks and open space. In addition, the City "bought down" the density units and sewer rights such that Sunlight was left with 1,000 of each for its remaining 592.6 acres. According to Muth, 54 of the density units were ultimately allocated to the area now comprising the Sonata Park property.

¶61 Muth-Hillberry asserts that the Sunlight Agreement "created vested density rights" which "may not be impaired by a subsequently adopted Growth Policy." At the outset, it is unclear from Muth-Hillberry's arguments what these "density rights" guarantee to their holder. Clearly, as Neighbors point out, they cannot include the right to enforce a certain density on Sunlight's lands, as such a promise by the City would be void *ab initio*. *See*

34

*Davis v. Pima County*, 590 P.2d 459, 461 (Ariz. App. 1978) ("The power to regulate land use through zoning ordinances is vested in municipal legislatures and they cannot bargain away this power."); Edward H. Ziegler, Jr., *Rathkopf's The Law of Zoning and Planning* vol. 3, § 44:11 (Thomson Reuters 2010). "A contract in which a municipality promises to zone property in a specified manner is illegal because, in making such a promise, a municipality preempts the power of the zoning authority to zone the property according to prescribed legislative procedures." *Dacy v. Village of Ruidoso*, 845 P.2d 793, 797 (N.M. 1992).

¶62    Moreover, the agreement does not appear to guarantee Sunlight a certain density in any event. It grants the City, in conjunction with the right to purchase 346.4 acres for use as public parks and open space, the additional right to fix the maximum density on the remaining 592.6 acres at 1,000 units. The agreement even states that if the City later zones the area at a higher density, Sunlight and its successors "shall nevertheless continue to be limited to the density allowances to which [Sunlight] is agreeing in this Option." But nothing in the agreement provides that Sunlight has the right to enforce a *minimum* density. To the contrary, the agreement states that if the City annexes Sunlight's land but fails to adopt zoning that would permit the development of 1,000 dwelling units, then Sunlight has the right to a prorated refund of its RSID payment. In other words, Sunlight and its successors are given not the right to 1,000 dwelling units, but the right to reimbursement in the event the adopted density is less than this amount.

¶63    Beyond its claim to "vested density rights," Muth-Hillberry's central argument is that if the densities recognized in the Sunlight Agreement conflict with the densities

35

recommended in the applicable growth policy, then the landowner "must resort to the zoning process to resolve the conflict." This view is based on paragraph 9 of the agreement, which states: "[I]n the event of conflict between the adopted comprehensive plan's land use designation for a parcel and the adopted zoning designation, the land use designation of the zoning controls subject, however, to other issues addressed in both the comprehensive plan and applicable zoning." Muth-Hillberry interprets this to mean that Sunlight and its successors may "utilize[ ] the zoning process to seek greater density than allowed by the Growth Policy, but less than allowed by the 1989 Agreement." Yet, while this interpretation is questionable, the fact remains that the City is statutorily required in "the zoning process" to "be guided by and give consideration to the general policy and pattern of development set out in the growth policy." Section 76-1-605(1)(c), MCA; *see also* § 76-2-304(1), MCA (municipal zoning regulations must be made "in accordance with a growth policy"). Thus, under Muth-Hillberry's own construction, the Sunlight Agreement does not supersede the applicable growth policy. The District Court correctly denied Muth-Hillberry's motion for summary judgment on this issue.

¶64 ***Issue 4. Was the City's decision on Sonata Park arbitrary, capricious, or unlawful?***

**Standard of Review**

¶65 In an appeal brought under § 76-3-625(2), MCA, the standard of review to be applied by the district court and this Court is whether the record establishes that the governing body acted arbitrarily, capriciously, or unlawfully. *Kiely Constr. LLC v. City of Red Lodge*, 2002 MT 241, ¶ 69, 312 Mont. 52, 57 P.3d 836; *Aspen Trails Ranch, LLC*

36

*v. Simmons*, 2010 MT 79, ¶ 31, 356 Mont. 41, 230 P.3d 808. The governing body's action is unlawful if it fails to comply with the requirements of applicable statutes. *See Aspen Trails*, ¶ 56; *Citizens for Responsible Dev. v. Bd. of County Commrs.*, 2009 MT 182, ¶ 26, 351 Mont. 40, 208 P.3d 876; *North Fork Preservation Assn. v. Dept. of State Lands*, 238 Mont. 451, 464, 778 P.2d 862, 870 (1989). The governing body's action is arbitrary and capricious if it came about seemingly at random or by chance, or as an impulsive and unreasonable act of will. *See Silva v. City of Columbia Falls*, 258 Mont. 329, 335, 852 P.2d 671, 675 (1993); *Kiely*, ¶ 69. In making this determination, the reviewing court must consider whether the governing body's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. *North Fork*, 238 Mont. at 465, 778 P.2d at 871; *see also e.g. Aspen Trails*, ¶¶ 56-57.

¶66    Review of the governing body's action is generally limited to the record before the governing body at the time of its decision. *Kiely*, ¶ 97; *Aspen Trails*, ¶¶ 61-67 (Rice, J., concurring), and cases discussed therein; *cf.* § 2-4-704(1), MCA (review of an agency decision "must be confined to the record"). In *Skyline Sportsmen's Assn. v. Bd. of Land Commrs.*, 286 Mont. 108, 951 P.2d 29 (1997), we concluded that it was appropriate for the district court in that case to accept new evidence and not to limit its review to the administrative record. *See id.* at 113, 951 P.2d at 32 (citing *Asarco, Inc. v. U.S. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980)). It should be noted, however, that the *Asarco* court limited the use of extra-record evidence to three purposes: for background information; for ascertaining whether the agency considered all the relevant factors; or for ascertaining whether the agency fully explicated its course of conduct or grounds of decision. 616

F.2d at 1160. The court stated that "[c]onsideration of the evidence to determine the correctness or wisdom of the agency's decision is not permitted, even if the court has also examined the administrative record." *Id.*

### "Substantial Compliance"

¶67 In order to determine whether the City's action was arbitrary, capricious, or unlawful, it is necessary first to resolve a threshold issue raised and argued by the City, Muth-Hillberry, Neighbors, and amici curiae.[6] This issue concerns the extent to which the City was required to consider and follow the recommendations in the Rattlesnake Valley plan when making its decision on Muth-Hillberry's Sonata Park application.

¶68 We addressed this same issue in *Little v. Bd. of County Commrs.*, 193 Mont. 334, 631 P.2d 1282 (1981). There, Flathead County argued that growth policies are "advisory only" and that a governing body is free to give a growth policy "whatever weight it wants," while the City of Kalispell and the plaintiffs-landowners argued that although a growth policy "need not be religiously followed in every detail, substantial compliance is required." *Id.* at 349, 631 P.2d at 1290-91. In addressing this question, we first observed that under § 76-1-605, MCA, a governing body adopting zoning ordinances or resolutions must "be guided by and give consideration to" the general policy and pattern of development set out in its growth policy. *Id.* at 349-50, 631 P.2d at 1291. Similarly, § 76-2-203, MCA (applicable to counties) and § 76-2-304, MCA (applicable to cities)

---

[6] Montana Environmental Information Center and Citizens for a Better Flathead (collectively, the Citizen Groups) filed an amicus curiae brief supporting Neighbors' position on this issue, while the Montana Association of Realtors® (MAR) filed an amicus curiae brief supporting the City and Muth-Hillberry's position.

38

provided that zoning regulations must be made "in accordance with" the growth policy. *Id.* at 352, 631 P.2d at 1292. Reviewing other planning and zoning statutes, we found that they placed "paramount importance" on growth policies and "rel[ied] heavily" on the planning board to provide "maximum input" to the governing body on the question of planning and zoning. *See id.* at 350-53, 631 P.2d at 1291-93. We reasoned from this that "[t]he vital role given the planning boards by these statutes cannot be undercut by giving the governing body the freedom to ignore the product of these boards—the [growth policy]." *Id.* at 353, 631 P.2d at 1293.

¶69 We recognized, though, that to require "strict compliance" with the growth policy would result in a growth policy "so unworkable that it would have to be constantly changed to comply with the realities." *Id.* On the other hand, "to require no compliance at all would defeat the whole idea of planning. Why have a plan if the local governmental units are free to ignore it at any time?" *Id.* Thus, we concluded that "[t]he statutes are clear enough to send the message that in reaching zoning decisions, the local governmental unit should at least substantially comply with the [growth policy]." *Id.* This standard, we explained, is "flexible enough so that the [growth policy] would not have to be undergoing constant change," but "sufficiently definite so that those charged with adhering to it will know when there is an acceptable deviation, and when there is an unacceptable deviation from the [growth policy]." *Id.* We reaffirmed these principles in *Bridger Canyon Prop. Owners' Assn. v. Plan. and Zoning Commn.*, 270 Mont. 160, 890 P.2d 1268 (1995), and *Ash Grove Cement Co. v. Jefferson County*, 283 Mont. 486, 943 P.2d 85 (1997).

¶70　In 2003, the Legislature revised some of the laws related to growth policies and planning boards. One of those was § 76-1-605, MCA, which the Legislature amended, in pertinent part, by adding a new subsection (2) and making subsection (1) "subject to" it:

> (1) Subject to subsection (2), . . . the governing body . . . must be guided by and give consideration to the general policy and pattern of development set out in the growth policy in the:
>
> .　.　.
>
> (c) adoption of zoning ordinances or resolutions.
> (2)(a) A growth policy is not a regulatory document and does not confer any authority to regulate that is not otherwise specifically authorized by law or regulations adopted pursuant to the law.
> (b) A governing body may not withhold, deny, or impose conditions on any land use approval or other authority to act based solely on compliance with a growth policy adopted pursuant to this chapter.

*See* Laws of Montana, 2003, ch. 599, § 7.

¶71　The parties and the amici dispute the significance of these amendments. The City, Muth-Hillberry, and MAR contend that the Legislature "abrogated" the "substantial compliance" standard. The City and MAR argue that the extent to which a growth policy must be addressed is now at the "full discretion" of the governing body. Conversely, Neighbors and the Citizen Groups maintain that the "substantial compliance" standard survived the legislative changes. Neighbors argue that subsection (2) simply "clarifies" that a growth policy is not the only document that matters when making land-use decisions and that other applicable regulations must be considered as well.

¶72　We acknowledged the amendments to § 76-1-605, MCA, in *Citizen Advocates for a Livable Missoula, Inc. v. City Council*, 2006 MT 47, ¶ 24, 331 Mont. 269, 130 P.3d 1259. We noted that "it may be assumed that the 2003 legislation was intended to reduce

40

in some fashion the reliance which local governing bodies are required to place upon growth policies when making land use decisions." *Citizen Advocates*, ¶ 25. But since the parties had framed their arguments under the "substantial compliance" standard and had offered no argument in support of changing it, we applied that standard and decided to "leave for another day the question of what effect the 2003 legislation has had." *Id.*

¶73   Three months later, we observed that "[t]he substantial compliance standard set forth in *Little* and affirmed in *Ash Grove Cement* incorporates the statutory standard in § 76-1-605, MCA, of being guided by and considering a growth policy." *North 93 Neighbors, Inc. v. Bd. of County Commrs.*, 2006 MT 132, ¶ 22, 332 Mont. 327, 137 P.3d 557. We reiterated this view in *Powell County v. Country Village, LLC*, 2009 MT 294, ¶ 24, 352 Mont. 291, 217 P.3d 508. Yet, in neither case did we expressly address the 2003 legislation. In *Lake County First v. Polson City Council*, 2009 MT 322, ¶ 42, 352 Mont. 489, 218 P.3d 816, we again opined that the 2003 legislation was "intended to alter this [substantial compliance] standard to some degree." But because the zoning at issue met the standard in any event, we did not address the impact of the amendments.

¶74   In the present case, the parties contend that the question whether, in light of the 2003 legislation, a governing body must "substantially comply" with its growth policy is now squarely before this Court. Indeed, Neighbors characterize this as the "central issue" in the case; Muth-Hillberry asserts that this is the "only" case in the last eight years "which squarely addresses the issue"; and the City maintains throughout its briefs that the District Court was wrong to apply the "substantial compliance" standard given the 2003 legislation. We agree that the question is properly presented, and, for the reasons which

41

follow, we hold that the "substantial compliance" standard still applies, but that it has been clarified in certain respects by the 2003 legislation.

¶75 As an initial matter, we reject the City's contention that the Legislature replaced the "substantial compliance" standard with a "full discretion" standard. This argument is premised on the title to Senate Bill 326 (2003) which states, in pertinent part:

> AN ACT GENERALLY REVISING THE LAWS RELATED TO GROWTH POLICIES AND PLANNING BOARDS; . . . PROVIDING THAT A GROWTH POLICY MUST INCLUDE REQUIRED ELEMENTS BY OCTOBER 1, 2006, *AND CLARIFYING THAT THE EXTENT TO WHICH THE REQUIRED ELEMENTS OF A GROWTH POLICY ARE ADDRESSED IS AT THE FULL DISCRETION OF THE GOVERNING BODY*; . . . . [Emphasis added.]

*See* Laws of Montana, 2003, ch. 599. The City repeatedly misstates the meaning of the italicized language. That clause has nothing to do with the amendments to § 76-1-605, MCA. Rather, it concerns the amendments to § 76-1-601, MCA. This latter statute governs the contents of a growth policy and, in subsection (3), lists the elements that a growth policy "must include." New language was added to the statute to clarify that "[t]he extent to which *a growth policy* addresses the elements listed in subsection (3) is at the full discretion of the governing body." Section 76-1-601(2), MCA (emphasis added). The error in the City's interpretation of SB 326's title thus becomes clear:

|  |  |
|---|---|
| City's interpretation: | "the extent to which the required elements of a growth policy are addressed [when deciding a zoning request] is at the full discretion of the governing body" |
| Actual meaning: | "the extent to which the required elements of a growth policy are addressed [in the growth policy] is at the full discretion of the governing body" |

SB 326's title does not support the City's "full discretion" approach here.

42

¶76 Conversely, the statutes underlying our adoption of the "substantial compliance" standard in *Little* still support its use. Section 76-1-605(1), MCA, still states that in the adoption of zoning ordinances or resolutions, the governing body "must be guided by and give consideration to" the general policy and pattern of development set out in the growth policy. As we said in *North 93 Neighbors*, ¶ 22, the "substantial compliance" standard "incorporates the statutory standard in § 76-1-605, MCA, of being guided by and considering a growth policy." Furthermore, §§ 76-2-203(1)(a) and -304(1)(a), MCA, still provide that county and municipal zoning regulations must be made "in accordance with" the growth policy—which, as we noted in *Citizen Advocates*, ¶ 22, seems to require a stricter adherence to the growth policy than mere "consideration" of it. The planning and zoning statutes in general continue to place paramount importance on growth policies and rely heavily on the planning board to provide input to the governing body on the question of planning and zoning. *See generally* Title 76, chapter 1, parts 1 and 6, MCA; *see also* §§ 76-2-201, -203, -204, -205, -303, -304, -310, MCA; §§ 76-3-509, -608, -621, MCA. Growth policies are still "the preeminent planning tool." *Ash Grove*, 283 Mont. at 494, 943 P.2d at 90; *Citizen Advocates*, ¶ 20; § 76-1-106(1), MCA. They are the product of extensive study, deliberation, and public involvement. Sections 76-1-601 to -604, MCA. The final product is a well thought out, long range, detailed and comprehensive planning document which takes into consideration past, present, and anticipated land uses in the jurisdiction and which is debated and adopted in an atmosphere that is free, to the extent possible, from the influence of special interests and political expedience. Thus, given the vital role played by planning boards and the significance attributed to growth policies, as

still reflected in Title 76, chapters 1 and 2, MCA, it belies common sense to suggest that a governing body no longer needs to comply with its growth policy.

¶77    The City and MAR advocate a standard of compliance that is minimal to the point of being nonexistent. They would have growth policies be treated as merely advisory or inspirational documents that the governing body may, in its "full discretion," disregard. This approach would undercut the value of growth policies and squander the substantial resources that are expended in developing them. Growth policies would become what the Planning Board member in the present case thought they were: a waste of people's time. The statutory scheme discussed above, however, makes it clear that in reaching zoning decisions, the governing body *still* must substantially comply with an adopted growth policy. In *Little*, we observed that this standard is flexible enough so that the growth policy will not have to be undergoing constant change, but sufficiently definite so that those charged with adhering to it will know when there is an acceptable deviation, and when there is an unacceptable deviation, from the growth policy. 193 Mont. at 353, 631 P.2d at 1293. The City, Muth-Hillberry, and MAR offer no persuasive reason to abandon the standard now.

¶78    There remains the question of what effect the 2003 amendments to § 76-1-605, MCA, have on the analysis. Again, the new subsection (2)(a) provides that "[a] growth policy is not a regulatory document and does not confer any authority to regulate that is not otherwise specifically authorized by law or regulations adopted pursuant to the law." And the new subsection (2)(b) states that "[a] governing body may not withhold, deny, or impose conditions on any land use approval or other authority to act based solely on

44

compliance with a growth policy adopted pursuant to this chapter." Based on a plain reading of these provisions,[7] we conclude that they were intended to clarify that *strict* compliance with a growth policy is not required. When interpreting a statute, all parts must be construed together without according undue importance to a single or isolated portion. *Rasmussen v. Lee*, 276 Mont. 84, 92, 916 P.2d 98, 103 (1996). Here, the governing body must be "guided by and give consideration to" an adopted growth policy, § 76-1-605(1), MCA, but the growth policy cannot be applied in a "regulatory" fashion, § 76-1-605(2)(a), MCA, and a land-use approval cannot be denied based solely on compliance with the growth policy, § 76-1-605(2)(b), MCA. This is fully consistent with the "substantial compliance" standard and supports continued application of it. It means that a proposed land use need not *strictly* comply with the provisions of the growth policy, but need only be in *substantial* compliance with it. A subdivision and zoning application that proposes 15 dwelling units cannot be denied solely because the growth policy recommends only 10. All facets of the proposed land use must be considered to determine whether, taken together, they comply *not strictly, but substantially* with the goals, objectives, and recommendations in the growth policy. Notably, we rejected the notion in *Little* of requiring "strict compliance" with the growth policy, which would be the equivalent of treating it as a regulatory document. We acknowledged that such an

---

[7] While MAR provides an extensive discussion of SB 326 in its brief, replete with quoted remarks that were made during the legislative hearings, Muth-Hillberry correctly points out that "[t]he language of the 2003 Amendments is clear and unambiguous, so this Court need not resort to extrinsic interpretational tools." *See In re Estate of Garland*, 279 Mont. 269, 273-74, 928 P.2d 928, 930 (1996) ("Where the language is clear and unambiguous, the statute speaks for itself and we will not resort to legislative history or other extrinsic means of interpretation.").

approach would be "unworkable." *Little*, 193 Mont. at 353, 631 P.2d at 1293; *see also Citizen Advocates*, ¶ 30 (to require a zoning proposal to be consistent with every goal and objective expressed in the growth plan documents would make growth policies "a rigid regulation, even exceeding the standard of 'substantial compliance' "). Section 76-1-605(2), MCA, codifies this holding.

¶79 For the foregoing reasons, we hold that the "substantial compliance" standard is still valid and that a governing body must substantially comply with its growth policy in making zoning decisions.

### Review of the City's Decision

¶80 The stipulated record fully supports the District Court's conclusion that the City did not substantially comply with the Rattlesnake Valley plan. Indeed, many of the city officials involved in approving Muth-Hillberry's application were openly contemptuous of the plan. Some second-guessed its goals and recommendations, others downplayed its relevance, and one bluntly characterized growth policies in general as a "waste of time." OPG cautioned at the outset that the subdivision, as proposed, could have deleterious effects on the neighborhood. Neighbors and two members of the City Council pointed out repeatedly that the subdivision did not honor the plan. Nevertheless, the City Council granted approval under the rationale that the City is growing and Rattlesnake Valley is not exempt—regardless of what the neighborhood plan might recommend.

¶81 The City's findings of fact and conclusions of law bear this out. By law, the City was required to be "guided by and give consideration to" the general policy and pattern of development set out in the Rattlesnake Valley plan. Section 76-1-605(1), MCA. Yet,

46

there are numerous components of the plan that the City did not give *any* consideration to in its findings and conclusions. Moreover, while the City states that it did "consider" other parts of the plan, there is little indication that the City was "guided by" them.

¶82 The plan's central component is its density recommendations. The plan divides Rattlesnake Valley into three regions (upper, middle, and lower) and recommends that development in each region be "at a scale which is compatible with the development patterns of existing Rattlesnake neighborhoods and the natural ecosystem which underlies and surrounds the entire study area." The plan carves up the valley into roughly a dozen density zones and then assigns a recommended density for each zone. The area proposed for Sonata Park is currently semirural with widely dispersed houses amidst open grassy hillside. The property is assigned the two lowest densities in the plan—one dwelling unit per two acres, and one dwelling unit per five to ten acres—which translates to seven or eight dwelling units.[8] The City, however, approved a 37-lot subdivision, roughly *five* times the recommended density. We agree with the District Court that this is a "significant deviation" from the plan. Not only that, it is the most important deviation because it undermines all other goals and objectives. As OPG explained,

> [t]he recommended land use designations included in the applicable plan are a mechanism that can help ensure that goals and objectives for the plan area are met. Development at densities higher than what is recommended in the applicable plan can have a significant negative impact on the natural resources, neighborhood character, and transportation capacity of the plan area as well as the health, safety and welfare of the Rattlesnake Valley residents.

---

[8] The City asserts that ten or eleven units would be permissible under the growth policy; however, this is contradicted by its own Rezoning Finding of Fact No. 82.

¶83 Besides density recommendations, the Rattlesnake Valley plan lists other goals and guiding principles, followed by recommended policies and actions. The District Court reviewed the Sonata Park subdivision in light of these goals and recommendations and found that the City had ignored or failed to substantiate its findings on a number of them. For example, Sonata Park is located within the City's Air Stagnation Zone, and the plan recommends limiting traffic congestion and encouraging pedestrian, bicycle, and transit use in order to minimize air pollution. The City, however, approved a subdivision that will nearly double the number of houses in the neighborhood and create 259 to 370 additional vehicle trips per day, without addressing the impact the resulting emissions will have on air quality. The plan also identifies the goal of preserving scenic views, including Waterworks Hill. The construction of 37 homes on 34 acres which, at present, consist mostly of open space bordering Waterworks Hill and are visible from the middle to upper Rattlesnake Valley will degrade the scenic views, not preserve them. The plan encourages the highest density of residential development in the southern portions of the valley and gradually lower density in the northern portions of the valley. The density of Sonata Park is more appropriate for the south valley, not the middle valley.

¶84 Three further goals stated in the plan are land preservation, wildlife protection, and protection of natural resources, including wildlife corridors and habitat. In this regard, there is a woody draw running east-west through Sonata Park. It is a "significant natural feature" and "an important wildlife corridor" between the North Hills open space and Rattlesnake Creek. The Sonata Park project, however, will put a road across the corridor and generate hundreds of vehicle trips per day. Furthermore, the plan calls for providing

48

connections between neighborhoods to parks, opens spaces, churches, commercial areas, and schools. The City purports to accommodate this goal by requiring Muth-Hillberry to dedicate a 20-foot-wide public pedestrian easement through the woody draw. In addition, to meet the "parkland dedication" requirement of its own subdivision regulations, the City approved a 16-acre common area—within which the woody draw is located. As the District Court noted, however, the City cannot use the woody draw to satisfy all three goals of providing a wildlife corridor, a public thoroughfare, and parkland. For one thing, the area is supposed to "remain undisturbed to facilitate wildlife movement through the area." Moreover, there are riparian resources within the woody draw, and locating a public easement through what purports to be the common area, the wildlife corridor, and the riparian-protection zone conflicts with the goals of the Rattlesnake Valley plan. As the court observed, "The common area cannot be all things."

¶85 The District Court identified additional areas in which Sonata Park is contrary to the goals and recommendations of the plan. The court also noted numerous goals and recommendations that the City had simply not addressed, or that the City had addressed but in conclusory fashion. The court ultimately concluded that while the valley can support additional incremental development, the current proposal for Sonata Park "fails to recognize, in large part, the semirural character of the area." The court observed that the subdivision, as proposed, "exists on a scale that is incompatible with the development patterns of the neighborhoods in the area and especially with the natural ecosystem that underlies the area." Hence, the court ruled that the City had failed to substantially comply with the plan.

49

¶86 On appeal, the City and Muth-Hillberry fail to present cogent arguments in support of their contention that the District Court erred. Instead, they quibble at length with various aspects of the court's decision and complain, in conclusory fashion, that the court simply got it wrong. First, Muth-Hillberry asserts that the District Court ignored certain factors weighing in the subdivision's favor, while the City contends that the court made "unlawful or incorrect findings." We have considered these arguments and found them to be without merit. The City also asserts that the 34 conditions placed on the subdivision approval demonstrate substantial compliance with the Rattlesnake Valley plan, but the City provides zero analysis showing this to be the case.

¶87 Next, the City accuses the District Court of wrongly faulting it for not addressing various elements of the Rattlesnake Valley plan in its findings and conclusions. The City claims that under SB 326, the extent to which it had to address the elements of the plan was "at the full discretion of the governing body." This argument, however, is misplaced for the reasons already discussed. *See* ¶ 75, *supra*. Also, it should be noted that a governing body is not entitled to rely on an "it's okay because we said it's okay" approach when developing the record underlying its decision. *North 93 Neighbors*, ¶ 29. As we have previously indicated, the governing body must develop a record that fleshes out all pertinent facts upon which its decision was based in order to facilitate judicial review. *North 93 Neighbors*, ¶¶ 29-30. For purposes of evaluating "substantial compliance," that includes all pertinent elements of the growth policy.

¶88 Finally, Muth-Hillberry attacks the Rattlesnake Valley plan for recommending too low of a density for Sonata Park and criticizes Neighbors for "refus[ing] to accept their

fair share of the exploding growth in the City." Yet, while Muth-Hillberry may disagree with the Rattlesnake Valley plan, that is not grounds to flout it. As we have said, "changes in the [growth policy] may well be dictated by changed circumstances occurring after the adoption of the plan. If this is so, the correct procedure is to amend the [growth policy] rather than to erode [it] by simply refusing to adhere to its guidelines." *Little*, 193 Mont. at 354, 631 P.2d at 1293.

¶89 The City reaffirmed the Rattlesnake Valley plan in 2006, and it thus continues "to have full force and effect" as part of the City's growth policy. Yet, notwithstanding that growth policy, the City approved a development which, as the District Court observed, exists on a scale that is incompatible with the development patterns of the neighborhoods in the area and especially with the natural ecosystem that underlies the area. While it is not necessary for the Sonata Park zoning to be "consistent with every goal and objective expressed" in the Rattlesnake Valley plan, *Citizen Advocates*, ¶ 30, it is necessary for the zoning to substantially comply with the plan. It does not, as established by the stipulated record and the City's findings of fact and conclusions of law.

¶90 We hold that the City's decision was unlawful due to the City's failure to comply with the mandates of §§ 76-1-605(1) and 76-2-304(1)(a), MCA, and was arbitrary and capricious because it was not based on all the relevant factors set out in the Rattlesnake Valley plan. The District Court correctly granted summary judgment to Neighbors.

## CONCLUSION

¶91 Neighbors have standing; any error the District Court made in granting Neighbors' motion to strike the Muth affidavit was harmless; the Sunlight Agreement does not

51

supersede the City's growth policy; the "substantial compliance" standard is still valid; and the City's decision to approve Sonata Park was arbitrary, capricious, and unlawful.

¶92    Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER
/S/ BRIAN MORRIS

# APPENDIX



53